**FULTON LODGE NO. 2 OF the INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Appellants,**

v.

**Franklin NIX, Appellee.**

**No. 24571.**

United States Court of Appeals
Fifth Circuit.

July 28, 1969.

J. R. Goldthwaite, Jr., Atlanta, Ga., James L. Highsaw, Jr., Edward J. Hickey, Jr., William J. Hickey, Washington, D. C., Adair, Goldthwaite, Stanford, Daniel & Horn, Atlanta, Ga., Plato E. Papps, Chief Counsel, Int. Ass'n of Machinists and Aerospace Workers, AFL–CIO, Washington, D. C., Mulholland, Hickey & Lyman, Washington, D. C., of counsel, for appellants.

William G. McRae, Atlanta, Ga., for appellee.

Before JOHN R. BROWN, Chief Judge, and AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This is an internal union free speech case governed by the Labor-Management Reporting and Disclosure Act of 1959.[1] The district court found that Appellee Nix was expelled from membership for the exercise of protected speech and ordered Fulton Lodge No. 2 and its international body, to reinstate Nix to full membership in the union and to refrain from further interference with his free speech rights. Nix v. Fulton Lodge No. 2, IAM, N.D.Ga.1967, 262 F.Supp. 1000.

We affirm in part and vacate in part.

The underlying facts are straightforward and undisputed. Nix was employed by the Grand Lodge of IAM as a press representative for the international union. He became a member of IAM, although membership was not a condition of employment, and affiliated with Fulton Lodge No. 2. His position with IAM was categorized as "staff employee." The staff employees were the only unit of IAM not organized and represented by an independent bargaining agent. Nix initiated an organizational campaign to form the IAM Representatives Association, an independent bargaining representative for the staff employees. The campaign extended for a year or more, with heat and passion not diminished by the fact that the employer was itself a union. Nix and IAM President Siemiller circulated mailings to the staff employees and to each other. Without

---

1. Jurisdiction in the district court is based upon LMRDA § 102, 29 U.S.C. § 412. Free speech within the union is guaranteed by the "Bill of Rights" provisions of LMRDA (Title I) under § 101(a) (2), 29 U.S.C. § 411(a) (2):

 "*Freedom of speech and assembly.*— Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization

or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

attempting to catalog all the vigorous remarks and charges made and the industrial warfare that took place, they included charges by Siemiller that Nix was making threats against him and the Executive Council of the union and was subjecting the union to constant harassment and propaganda in the press and elsewhere. Siemiller charged that "Nix had made many false statements in the material that he has sent you while conducting his organizing campaign." Nix made a written charge that per diem was being paid by the union to employees in violation of the constitution, and demanded of Siemiller that he proceed to recover from Siemiller himself, other officers and members of the Executive Council, and the sureties on their bonds, union funds said to have been improperly paid out. Nix brought a § 8(a) (5) charge against IAM, then withdrew it. He made a series of charges of fraud and misconduct against a member of the Executive Council, and an investigating committee considered the charges and rejected them. Siemiller wrote Nix, implying that he might be discharged, stating that he and his "Associates on the Executive Council" were not justified in continuing Nix's employment if in their judgment he was not needed. Nix carried on a running argument with Siemiller about vacation, automobile mileage, exclusion of Nix from meetings, isolation of Nix from other employees, and a variety of other matters.

A representation case was brought before the National Labor Relations Board. The Board certified the Representatives Association as the appropriate bargaining unit and ordered an election.

After the Board order but before the election Nix wrote and disseminated to staff employees a letter stating *inter alia*

that "Bob Quick, general chairman of United Airlines (then Capital) didn't hesitate to picket Grand Lodge when he thought Hayes [former IAM President] ordered him to trample on the rights of his members. You know what happened? They broke their necks getting down to settle things with Bob and get him off that sidewalk. Would Bob do it again? Ask him?" A second letter, responding to Quick's denial that he ever picketed the international, admitted that the information was derived from hearsay sources, but noted that, on confrontation by Nix, Quick did not deny the incident. These letters were only two of more than twenty mailings that Nix sent out in his organizational efforts.

The election was held and the Representatives Association won. Approximately a month later Siemiller notified Nix that he was fired. A few days later, September 6, 1966, Nix filed unfair practice charges against the union. The next day Bob Quick, a member of and president of an IAM local in California, invoked provisions of the IAM constitution (1966),[2] and charged Nix with misconduct in making the statements concerning Quick in the two letters described above. The alleged misconduct is that described by Art. L, § 3, which subjects a member to possible reprimand, fine, suspension and/or expulsion from membership after notice and hearing for, *inter alia:*

> Circulating or causing in any manner to be circulated any false or malicious statement reflecting upon the private or public conduct, or falsely or maliciously attacking the character, impugning the motives, or questioning the integrity of any member or officer.[3]

---

2. All references to the union constitution are to that of 1966.

 This particular provision is Art. L, § 7, which governs the procedure for preferring charges against a member for a violation other than of his duties as an officer or representative of the Local Lodge or District Lodge.

3. Provisions such as this, limiting criticism of union members and officers, are not unique to IAM. See the remarks of Senator Goldwater (R-Ariz.) on the Senate floor that, as of 1959, the constitutions of "74 unions limit member criticism of officers and fellow members and 15 unions prohibit the issuance of any literature

The charges brought by *Quick* alleged misconduct in terms tracking the above language almost verbatim except for the insertion of the dates of the two Nix letters.

A hearing was conducted before a trial committee [4] which knew of the pendency of the charges made by Nix to the NLRB. The committee found that Nix "did circulate or cause to be circulated a false and/or malicious statement reflecting upon [Quick's] private or public conduct, which statement falsely and/or maliciously attacked his character and integrity as a Union member." The committee recommended that Nix be expelled from membership. By overwhelming votes the Fulton Lodge membership sustained both the report and the recommended expulsion.

The trial committee noted in its report to the Fulton Lodge membership that it excluded from evidence in the misconduct proceedings "statements and/or documents [which Nix tried to have admitted] pertaining to his discharge from the Staff and his organizing campaign, which in our opinion as a Trial Committee, had nothing to do with this case." See Part III, *infra.*

After the trial committee hearing and before the local membership vote, Nix filed his complaint in district court without attempting to exhaust his appellate remedies under the IAM constitution.[5]

In the district court Fulton Lodge filed a three-pronged motion to dismiss:

(1) district court jurisdiction was preempted by the unfair practice charge pending before the Board; (2) Nix waived his right to judicial review by his failure to exhaust his internal appellate remedies; (3) and Nix's statements, made in the context of an organizational campaign, were "extraunion" and consequently unprotected by the free speech provisions of the LMRDA. The motion was denied. On appeal Fulton Lodge raises the identical issues on specification of error, to which is added a fourth: (4) the district court erred in making its order applicable to the IAM Grand Lodge, i. e., to the international union as a whole.

The unfair practice proceedings were still pending when the district court entered its judgment below. Subsequently, but before submission of this appeal, the Board decision was rendered, finding that the discharges of Nix and others were not discriminatorily motivated but that after the Representatives Association was certified as bargaining agent IAM, by refusing to furnish it with requested information, breached its duty to bargain. *IAM and Nix* et al., 172 NLRB 239.

## I. Preemption

■ Congress expressly provided two broad anti-preemption provisions in the LMRDA [6] in response to objections initially raised by then Sen. John F. Kennedy (D–Mass.).[7] This court has held

---

emanating from members unless the consent of the national officers is received." 2 Legis.Hist. of the LMRDA 1235 (NLRB ed. 1959) (hereinafter "2 LMRDA * * *").

4. Art. L, § 8 of the IAM constitution requires that a five man hearing committee be appointed by the local union president to conduct the disciplinary proceedings, file a report to the membership, and make recommendations of punishment.

5. The intra-IAM appellate review procedure calls for a member disciplined by a local lodge to petition successively the IAM President, the Executive Council, and finally the Grand Lodge Convention.

Each petition must be made within 30 days of the decision in the previous disposition. Art. L, §§ 14–16.

6. LMRDA §§ 103 and 603, 29 U.S.C. §§ 413 and 523. The former is expressly applicable to Title I; the latter is a "catchall" for the entire Act. *See* Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 176 (1960); *see also* Summers, Preemption and the Labor Reform Act—Dual Rights and Remedies, 22 Ohio St.L.J. 119, 123–128 (1961).

7. 2 LMRDA 1108–1112, 1221, 1233–1235. The House substitute for S. 1555 retained the Bill of Rights provisions from the

that rights guaranteed under the LMRDA are not subject to preemption by the National Labor Relations Board. International Bhd. of Boilermakers, etc. v. Braswell, 5 Cir. 1968, 388 F.2d 193, 195–196.[8]

## II. Exhaustion of remedies

■ We have no difficulty in concluding that the district court did not err in holding that the facts of Nix's case were such as not to require him to exhaust intra-union remedies under § 101(4) of LMRDA, 29 U.S.C. § 411(a) (4).[9] Detroy v. American Guild of Variety Artists, 2 Cir. 1961, 286 F.2d 75, 79. The subsection does not establish a jurisdictional bar or absolute waiver to judicial review, but preserves the discretionary exhaustion doctrine which allowed pre-LMRDA courts to determine whether pursuit of internal remedies should be required in a given case. Simmons v.

Avisco, Local 713, Textile Workers, 9 Cir. 1965, 350 F.2d 1012; Detroy, *supra*; cf. NLRB v. Industrial Union of Marine & Shipbuilding Workers, 1968, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706. The first review authority to whom Nix would have been required to apply was IAM President Siemiller, and the next review authority was the Executive Council. The continuing difficulties between Nix on the one hand and Siemiller and the Executive Council on the other fully justified the district court's conclusion that Nix was not required to attempt to exhaust his intra-union appellate remedies before seeking judicial relief. See Calagaz v. Calhoon, 5 Cir. 1962, 309 F.2d 248, 259–260. Cf. Glover v. St. Louis-San Francisco Ry. Co., 1969, 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (U.S. Jan. 14, 1969) (under Railway Labor Act). The union is the victim of its own appellate review structure.[10]

Senate bill, including Section 103. 2 LMRDA 1520. On the day the Landrum-Griffin Bill was signed into law Senator Goldwater remarked on the Senate floor:

"Section 103 preserves any other rights and remedies which a union member may have under any other State or Federal law, before any other court or agency, or under any union constitution or bylaws. It thus guards against the application of the preemption problem in connection with the newly granted bill of rights, and preserves any broader safeguards for union members which may be contained in some union constitutions or bylaws."

8. In *Braswell* the plaintiff sought damages only, not reinstatement. Nix seeks both damages and reinstatement. As discussed below, the district court reserved the question of damages.

9. *"Protection of the right to sue.*—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency; irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding; or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Pro-*

*vided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition."

10. *But compare* Note, Public Review Boards: A Check on Union Disciplinary Power, 11 Stan.L.Rev. 497 (1959) (examines impartial review boards established in 1954 and 1957 by the Upholsterers and the United Auto Workers Unions). IAM's self-regulation argument, *see* Cox, The Role of Law in Preserving Union Democracy, 72 Harv.L.Rev. 609, 615 (1959), would be more efficacious if the union's constitution or by-laws provided for impartial review. *See* Lipset, The Law and Trade Union Democracy, 47 Va. L.Rev. 1, 47–49 (1961). One critic has noted: "appeals to international presidents and councils, though generally permitted, cannot be expected to cure political infections in trials below, as international officers are no more immune to factional politics than those of locals." Note, Free Speech, Fair Trials, and Factionalism in Union Discipline, 73 Yale L.J. 472, 483–484 (1964).

## III. The offensive statements: protected or not?

Fulton Lodge presses the theory that statements made in the context of an intra-union organizational campaign are "extra-union" comments and not protected. The fallacy in this argument lies in the facts. Nix was expelled from membership, according to the trial committee report, solely for the effect of the remarks upon Quick's personal character and union reputation, not on the basis of any organizational activity. As we have noted above, the committee excluded from evidence statements and documents proffered by Nix pertaining to the organizing campaign and to his discharge, on the ground they had nothing to do with the case.

The union-employee and union-officer cases relied on by the union miss the mark.[11] This is a "union-member" case. *See* 262 F.Supp. at 1004.

The Bill of Rights (Title I) of the LMRDA did not enjoy an orderly genesis.[12] Consequently the statutory language and the legislative history are a source of confusion as well as enlightenment.[13] The courts, therefore, have substantially shaped the Bill of Rights into a guarantee of union democracy, with the right of free speech enjoying a particularly favored position. The landmark decision interpreting LMRDA § 101(a)(2) is Saltzhandler v. Caputo, 2 Cir. 1963, 316 F.2d 445, in which the Second Circuit held that a union may not subject to retributive disciplinary action a member accused of libeling or slandering a union officer. The *Saltzhandler* rationale has been subsequently extended by the courts to protect from disciplinary retribution numerous types of communication.[14]

11. *See, e. g.*, Strauss v. International Bhd. of Teamsters, E.D.Pa.1959, 179 F.Supp. 297, 300. Accord: Thompson v. New York Cent. R. R. Co., 2 Cir. 1966, 361 F.2d 137, 145; Airline Stewards & Stewardesses Assn. Local 550, TWU, AFL-CIO v. Transport Workers Union, 7 Cir. 1964, 334 F.2d 805, 808; Hill v. ARO Corp., N.D.Ohio 1967, 275 F.Supp. 482, 489. The gist of the above cases is that the LMRDA protects membership rights only, not rights to continued employment or office.

12. For comprehensive analyses of the legislative travail surrounding the formulation of the Bill of Rights, *see* Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 851 (1960); Cox, Internal Affairs of Labor Unions under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819 (1960); Hickey, The Bill of Rights of Union Members, 48 Geo.L.J. 226 (1959); Rothman, Legislative History of the "Bill of Rights" for Union Members, 45 Minn. L.Rev. 199; Sherman, The Individual Member and the Union: The Bill of Rights Title in the LMRDA of 1959, 54 N.W.L.Rev. 803 (1960); Smith, The LMRDA of 1959, 46 Va.L.Rev. 195 (1960). The provisions of Title I were born amidst stormy debate on the Senate floor. *See* 2 LMRDA 1102–1119, 1220–1239 (debates and votes on the McClellan and Kuchel amendments).

13. Since the Bill of Rights was an amendment introduced from the floor, it never received "the careful technical review and clarification which comes from scrutiny by a congressional committee and its legislative staff." Cox, *supra* note 12 at 831–833. One commentator has complained that "resort to [LMRDA] legislative history will at best be difficult, and may serve more to obscure than to illuminate intent." Smith, *supra* note 12, at 198. Yet another has observed:

"Turning to the statute for assistance is similarly frustrating. Since Title I was presented from the floor, it contains purposeful ambiguities and technical compromises thought necessary to insure passage. Moreover, it [the Kuchel substitute amendment] was hastily drawn to modify what had become an inevitable individual rights section of the act."

Atleson, A Union Member's Right of Free Speech and Assembly: Institutional Interests and Individual Rights, 51 Minn. L.Rev. 403, 409. Archibald Cox, labor law professor and former Solicitor General, suggests that "courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words." Cox, *supra* note 12, at 852.

 From this judicial evolution of the scope of the LMRDA free speech protection, a general rule is perceivable: a union member has the statutory right "to express any views, arguments, or opinions" inside or outside of a union meeting,[15] subject to only three general limitations: (1) reasonable union rules relating to the conduct of union meetings; (2) reasonable rules relating to individual responsibility to the union as an institution; and (3) reasonable rules requiring members to refrain from conduct which would interfere with the union's performance of its legal or contractual obligations. The first limitation is immaterial to the case at bar. The "reasonableness" standard of the latter two limitations is a legacy of legislative compromise which leaves the balancing of the institutional interests and individual rights to the trial judge.[16] The district court correctly held that the union did not show Nix's statements to fall within the ambit of either of these provisos. He cannot be disciplined for the substance and effect of his comments about Quick. *See* Saltzhandler v. Caputo, *supra*, 316 F.2d at 450 n. 8. As the Second Circuit held in *Saltzhandler:*

"The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain."

14. *See e. g.,* Giordani v. Upholsterers International, 2 Cir. 1968, 403 F.2d 85 (accusations of union fund misappropriation); International Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers v. Rafferty, 9 Cir. 1965, 348 F.2d 307 (circulation outside the union of handbills proposing by-law revisions); Cole v. Hall, 2 Cir. 1965, 339 F.2d 881 (malicious vilification of union officers); Farowitz v. Associated Musicians, 2 Cir. 1964, 330 F.2d 999 (exhortation to fellow members not to pay dues believed to be illegally excessive); Kelsey v. Philadelphia Local 8, International Alliance of Theatrical Stage Employees, E.D.Pa.1968, 294 F.Supp. 1368 (job assignment complaints); Archibald v. Local 57, Operating Engineers, D.R.I. 1967, 276 F.Supp. 326 (publication and distribution of material libelous of union officers and business agent); Deacon v. Operating Engineers, Local No. 12, C.D. Calif.1967, 273 F.Supp. 169 (authorship of newspaper article stating personal opinions and containing accusations against union officers); Leonard v. M.I.T. Employees Union, D.Mass.1964, 225 F.Supp. 937 (circulation of defamatory material); Graham v. Soloner, E.D. Pa.1963, 220 F.Supp. 711 (picketing); Gartner v. Soloner, E.D.Pa.1963, 220 F. Supp. 115 (picketing); Stark v. Twin City Carpenters District Council, D. Minn.1963, 219 F.Supp. 528 (slander of union business agent during meeting). See also, Note, Bill of Rights of Members of Labor Organizations, 1959–1964, 40 Notre Dame Law. 86, 94–95 (1964).

15. As a result of Senator McClellan's insertion of a semicolon after the word "opinions" in the Kuchel text, the guarantee was expressly extended beyond mere union hall comments to cover any statement concerning union affairs, including those made in public. *See* 2 LMRDA 1230; *see also* 2 LMRDA 1236, 1270, 1280. *See generally* Atleson, *supra* note 13, at 431, 441; Sherman, *supra* note 12, 818.

16. *See* Aaron, *supra* note 12, at 865–866: "Almost all unions claim the right to discipline individual members or groups of members who openly challenge the authority of their leaders, especially when such conduct carries overtones of rival unionism or alliances with employers. No one can reasonably object to giving a legitimate organization the right to protect its institutional interests; yet it is undeniable that unions, like other voluntary associations, in time succumb to the 'iron law of oligarchy.' Democracy cannot thrive in an environment hostile to dissent and opposition; therefore a line must somehow be drawn between legitimate resistance and illegal subversion." *See also* Cox, *supra*, note 12, at 834–835; "Dissent in a union, like treason in a nation, must be suppressed if the purpose is to destroy the union, encourage a rival, or bring about the violation of legal or contractual obligations."

316 F.2d at 448–449. The statements of Nix here involved were protected speech.[17]

## IV. Scope of relief

The injunctive relief granted by the district court purported to bind the international organization as well as the local lodge. The international body was not named in the Nix complaint as a party, was not served with process, did not appear as a party, and no express relief was sought against it.[18] Nix moved for leave to join the international as a party, but rather than specifically ruling on the motion the district court treated the action as one against the union as a whole and not against individuals or a branch of the union, considering that the union had no legal existence as an entity separate from its members and that the international was in active concert with the subordinate local by and through the constitution and by-laws. The court concluded that the action was in the nature of a class action. Also it held Fulton Lodge No. 2 was merely an agent of the international.[19]

Unquestionably Fulton Lodge is a creature of the international organization, created and controlled by the IAM constitution and by-laws.[20] The charges filed with the local organization were dictated by both substantive and procedural directives contained in the IAM constitution. *See* notes 2 through 5, *supra*, with accompanying text. Prosecution of charges against an IAM member cannot, under the circumstances, be considered the independent action of an autonomous local organization. Furthermore, membership, though initiated by and through the local organization according to the constitution,[21] is in the *international* union.[22] And the international organization, to a large extent, is responsible for the actions, of its subordinate bodies. *See generally* Evans, The Law of Agency and the National Union, 49 Ky.L.J. 295 (1961). Cf. 1 CCH Lab.Law Rep. ¶ 1695.70 (pointing out that the NLRA § 2(13), 29 U.S.C. § 152(13), perpetuates the common law rules of agency to govern international-subordinate responsibility). In addition, it would be difficult to effectuate the

---

17. The protection provided by LMRDA § 101(a) (2), 29 U.S.C. § 411(a) (2), is not absolute. A union or its officers simply may not use their disciplinary powers and processes to suppress statements made by a member so long as such comments do not fall within the ambit of the general limitations of the statute designed to provide institutional security. A union member or official who considers himself defamed by the statements of another member, is not preempted by the LMRDA from recourse to a civil action for defamation. See Saltzhandler v. Caputo, *supra*, 316 F.2d at 451. Cf. Linn v. United Plant Guard Workers, 1966, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (under Labor-Management Relations Act); Pettway v. American Cast Iron Pipe Co., 5 Cir. 1969, 411 F.2d 998 [May 22, 1969], slip opinion at p. 18, n. 22.

18. The complaint sought a declaration that the statements concerning Quick did not "afford a basis for disciplinary action against plaintiff *by Fulton Lodge No. 2*" and that "the prosecution of plaintiff on

such charges *by such lodge*" violated the rights secured to him by 29 U.S.C. § 411 (a) (2).

19. We are required to note lack of jurisdiction apparent on the face of the record, so we are not concerned with whether the local, named as a party, can raise on appeal the validity of extending the injunction to include the entire union, not named as a party.

20. Art. I, § 3, Art. VI, § 5, and Art. D, §§ 1–12, describe the governmental organizational structure of the IAM, its supervisory power over subordinate bodies, and the regulations controlling government of the local lodges. The provisions leave no doubt that the ultimate power within the institution is not in the local lodges.

21. Art. I, §§ 1 and 2 (eligibility criteria and procedure governing local lodge investigation and election to membership).

22. Art. I, § 13 (affiliation with a local or district lodge is transferable throughout the IAM).

purposes of the LMRDA free speech provision in a case such as is before us, where membership is in the international, if the international cannot be subjected to a remedial order.

But the existence of the substantive elements of a cause of action did not vest the district court with jurisdiction over the international. LMRDA § 102, 29 U.S.C. § 412 permits the district court to grant "such relief (including injunctions) as may be appropriate," but this does not expand in personam jurisdiction beyond that arising from proper designation of a party as defendant and proper service of process upon the party. See Fed.R.Civ.P. 19(a) and 4(d) (3). Calazaz v. Calhoon, 309 F.2d 248 (5th Cir. 1962) is not to the contrary. That case was brought as a class action against all members of a union and against individuals who were representatives of the class. The plaintiff denied any intent of making the union itself a party defendant. Service of process was had on an officer of the union who gave actual notice to the membership who comprised the class. Nix did not name or seek process or relief against the international union to the extent it can be sued as though a jural entity, nor did he bring a class action against members of the international association with process on a member of the class. Nix sued the local lodge and its president. This is not enough to bind the international.

However, Nix was entitled to amend to seek relief against the international. On remand he should be given that right if he still desires it.

## V. Damages

The district court reserved for future determination the question of compensatory damages to Nix.[23]

We affirm in part, vacate in part and remand for further proceedings not inconsistent with this opinion.

23. The court struck Nix's claim for punitive damages. This was correct. International Brotherhood of Boilermakers etc. v. Braswell, 5 Cir. 1968, 388 F.2d 193.