Mike SEMANCIK and Tony Pappas

v.

UNITED MINE WORKERS OF AMER-
ICA DISTRICT #5, Appellant
in No. 71–1531.

Michael ENCRAPERA and Leon
Yablonski

v.

UNITED MINE WORKERS OF AMER-
ICA DISTRICT #5, Appellant
in No. 71–1532.

Louis ANTAL et al.

v.

DISTRICT #5, UNITED MINE WORK-
ERS OF AMERICA, Appellant
in No. 71–1533.

Nos. 71–1531 to 71–1533.

United States Court of Appeals,
Third Circuit.

Argued April 20, 1972.

Decided Aug. 16, 1972.

Melvin P. Stein, Kuhn, Engle & Blair, Pittsburgh, Pa. (Lloyd F. Engle, Jr., Pittsburgh, Pa., on the brief), for appellant.

Daniel B. Edelman, Washington Research Project, Washington, D. C. (Joseph A. Yablonski, Clarice R. Feldman, Washington, D. C., Kenneth J. Yablonski, Washington, Pa., on the brief), for appellees.

Before ADAMS, MAX ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

Although these cases present several interesting questions pertaining to union procedures, in disciplinary actions directed at union members, the novel point at issue, is whether a district court may permanently enjoin a union from prosecuting members under a section of its constitution because of its infringement upon the right of free speech.

In each of the three cases here on appeal, plaintiffs, members of the United Mine Workers of America, were opponents of the incumbent officers of District # 5. They sought to enjoin disciplinary action which was being brought against them by the District's Executive Board. They alleged that the District's actions infringed upon their right of free speech, guaranteed to them under Section 101(a) (2) of the Labor Management Reporting and Disclosure Act of 1959 (also known as the Landrum-Griffin Act and known hereinafter as "LMRDA"), 29 U.S.C. § 411(a) (2).

In both the first and second cases, the district court found that the disciplinary actions were discouraging members from speaking out freely and granted preliminary injunctions. When the District brought the third action, the court concluded that the provision under which all the proceedings had been brought, Article X, Section 10 of the District's Constitution, was overly-broad and vague;

and that it infringed on the rights of free speech and fair hearing guaranteed to union members under Sections 101(a) (2) and (5) of the LMRDA.[1] It permanently enjoined any prosecutions under the provision. District # 5 has appealed. We agree with the district court and affirm its order.

These cases grow out of the December 1970 election for District # 5's officers. The election was heatedly contested, with an insurgent group called Miners for Democracy challenging all of the incumbent officers, including District President Michael Budzanoski. The charges flew back and forth and on November 13, 1970, Mike Semancik and Tony Pappas, two elderly, retired miners, added further fuel to the electoral fires by signing an affidavit accusing Budzanoski's father of being a leader of a group of strikebreakers in 1927. The affidavit was apparently circulated by Miners for Democracy as campaign material during the remaining weeks of the election.

After the election was over and the defeated insurgents had filed a challenge with the Department of Labor seeking to overturn the results, Joseph Budzanoski, Michael's brother, sent a complaint to the District Executive Board alleging that Semancik and Pappas had violated Article X, Section 10 by signing the affidavit, which he charged was untrue. Their actions were characterized as violating the section, which provides in part, that:

[A]ny member or members resorting to dishonest or questionable practices to secure the election or defeat of any candidate for district office shall be tried by the district executive board and fined, suspended or expelled as the magnitude of the transgression may warrant.

On January 19, 1971, the District Executive Board notified the two men that there would be a hearing on February 8

1. The opinion of the district court is reported at 324 F.Supp. 1292 (W.D.Pa.1971).

next at 11:00 A.M. on the charge.[2] On February 5 Semancik and Pappas filed an action in the district court requesting a temporary restraining order and preliminary injunction against the District's actions, based on an alleged infringement of their right of free speech.

The court granted the temporary restraining order on February 8. However, before it could be served, the Executive Board began and concluded the hearing on Semancik and Pappas, notwithstanding the presence and participation of its counsel at the earlier court hearing that day.

Subsequently, at the hearing on the preliminary injunction on February 16 there was considerable testimony that the prosecutions under Article X, Section 10, harassed the plaintiffs in the exercise of their rights. Further, several witnesses testified that they believed that the actions were intimidating the supporters of Miners for Democracy, particularly retirees who feared that any disciplinary action against them would result in the loss of their pensions. For this reason, the district court concluded that there would be irreparable harm to the plaintiffs and others similarly situated if the union took action against them. It ordered a preliminary injunction restraining any disciplinary measures.

The District Executive Board notified Leon Yablonski and Michael Encrapera on February 10 that notwithstanding the district court's disapproval of the actions against Semancik and Pappas, Joseph Budzanoski had filed a similar charge against them under Article X, Section 10 because they had supposedly secured the Pappas and Semancik affidavit.[3] On February 25, Yablonski

---

2. The relevant parts of the District's letter to Semancik and Pappas, and the relevant parts of Joseph Budzanoski's complaint, which was included with the District letter, are as follows:

"Dear Sir and Brother: Please be advised that charges have been preferred against you before the District Five Executive Board under Section 10, Article X, of the District Constitution.

These charges were preferred against you because of an affidavit which you jointly signed with another member of the union and which affidavit was widely circulated during the recent district election. Enclosed herein is a copy of the charges filed by Joseph Budzanoski, a member of Local Union No. 1197, United Mine Workers of America, which is self-explanatory.

. . . .

Fraternally yours, FOR THE DISTRICT FIVE EXECUTIVE BOARD JOHN SEDDON, John Seddon, Secretary-Treasurer"

Dear Sir and Brother:

Enclosed herein are copies of an affidavit and a mimeographed letter that were widely circulated among members of District #5 U.M.W.A. prior to the recent District #5 U.M.W.A. elections held on Tuesday, December 8, 1970. These documents are replete with his falsehood and distortions concerning my late father, Joseph Budzanoski, who died about twenty years ago.

As his son and as a member of Local Union No. 1197 U.M.W.A. I wish to prefer charges against the three members of our union who prepetated [sic] this foul act.

Therefore under Section 10 of Article X of the Constitution of District #5 United Mine Workers of America I am preferring charges against Mike Semancik and Tony Pappas, both members of Local Union No. 1787 U.M.W.A. for signing an affidavit that was false and distorted and for permitting it to be freely circulated in the afore mentioned election. . . . Fraternally Yours, JOE BUDZANOSKI"

3. The relevant parts of the District's letter and Budzanoski's complaint are: Dear Sir and Brother: This is to advise that Mr. Joseph Budzanoski, a member of Local Union No. 1197, Ellsworth, Pennsylvania, has filed charges against you before the District Five Executive Board under Section 10, Article X, of the District Constitution.

Enclosed is a copy of the statement and charges filed by Joseph Budzanoski.

. . . . .

Fraternally yours, FOR THE DISTRICT FIVE EXECUTIVE BOARD, JOHN SEDDON, John Seddon Secretary-Treasurer."

Dear Sir and Brother:

From certain evidence that has come to my attention it appears that Mr. Michael Encrapera of L.U. No. 1787 U.M.W.A.

and Encrapera filed a complaint seeking a preliminary injunction against their proceedings. After a hearing at which they testified to the substantial "chilling effect" of their prosecutions, the court consolidated the cases and granted a second preliminary injunction.

Even though there had now been two preliminary injunctions barring disciplinary actions against insurgents under Article X, Section 10, Michael Budzanoski, John Seddon, the incumbent Secretary-Treasurer, and four of their supporters, filed charges against their chief opponents in the recent election.[4] Louis Antal, who had run against Budzanoski, Joseph Daniels, who had opposed Seddon and was a teller in the election, Nick DeVince, who had run for International Executive Board member, and Steve Segedi, who had run for District Executive Board member, were charged with the "dishonest and questionable practice" of openly accusing the incumbent union officers of tampering with boxes holding absentee ballots. In essence, the complaint was brought by one group of candidates against their opponents for seeking the help of the Department of Labor. There was no explanation why the

charges, which arose out of incidents that occurred around November 30, 1970, had not been initiated earlier. Further, although Budzanoski and Seddon excused themselves from sitting on the Executive Board when it would hear the case, some of the remaining Board members were closely allied with Budzanoski and Seddon and had been opposed by Miners for Democracy in the election.

A third hearing was held at this point, and the final case was consolidated with the other two. The district court found that the successive attempts by the District Executive Board to use the broad powers of Article X, Section 10 against their opponents while the election was being challenged before the Secretary of Labor was a "studied evasion or disregard of prior orders enjoining such practices." The court further concluded that the provision violated Section 101(a) (5) of the LMRDA, guaranteeing a full and fair hearing on the basis of written, specific charges. In its opinion, it was impossible for members to be treated impartially because their case would be heard by the very incumbent board whose re-election they had contested. Even if the particu-

---

and Mr. Leon Yablonski of LU. 6831 U.M.W.A. were instrumental in securing the signatures of Tony Pappas and Mike Semancik upon an affidavit that was false and distorted. This affidavit which debased, demeaned and degraded my father, Joe Budzanoski, who died on March 15 1950 over 21 years ago, was used in the recent district election held on Dec. 8 1970. It was circulated by using the mailing list of the district office to every U.M.W.A. member in District #5 and was calculated to secure the defeat of my brother Michael Budzanoski, who was a candidate for reelection as district president.

Therefore under Section 10 of Article X of the Constitution of District #5 United Mine Workers of America, I am preferring charges against Michael Encrapera and Leon Yablonski for resorting to dishonest and questionable practices to assure the defeat of a candidate in the aforementioned election. . . . Fraternally yours JOE BUDZANOSKI."

4. The relevant parts of the District's letter and the complaint which was again enclosed with the letter, are as follows:
"Dear Sir and Brother:
Please be advised that charges have been preferred against you before the District Executive Board of District Five, United Mine Workers of America. Enclosed herein is a copy of the charges which are self-explanatory. . . .
Fraternally yours, FOR THE DISTRICT FIVE EXECUTIVE BOARD JOHN SEDDON, John Seddon, Secretary-Treasurer."
"Dear Sir and Brothers
We, the undersigned, hereby prefer charges against Brother Steve Segedi, Local Union No. 1190 U.M.W. of A. for violation of Article 10 Section 10 of the district Constitution for disseminating false information and making false accusations among members of the Union and the general public pertaining to alleged tampering with absentee ballots in the District five election held on December 8, 1970. Fraternally yours, MICHAEL BUDZANOSKI" et al.

lar charging parties disqualified themselves, the district court believed that a panel of the other board members, who were their allies, was not an unbiased tribunal. Further, it found that charges framed in terms of "dishonest or questionable practices" were not sufficiently specific to meet the requirement of the statute.

The district court held that the broad terms of Article X, Section 10, were also vague, denying members a readily ascertainable standard of conduct. As such, it put the members at their peril whenever they exercised their free speech rights, and raised the probability that clearly protected activity would be punished under the provision. It then concluded that any prosecution under the provision would offend the rights guaranteed under Section 101(a) (2).

Having found that any internal appeals to correct the situation would be futile because they would have been addressed to the officers who had filed the complaints, it granted the permanent injunction at issue on this appeal.

■■■ The District first objects that the court should have ordered the plaintiffs to first seek relief within the union for four months, as it could have required them to do under Section 101(a) (4) of the LMRDA.[5] However, the limitations of Section 101(a) (4) are permissive and since the landmark case of Detroy v. American Guild of Variety Artists, 286 F.2d 75 (2d Cir. 1961), cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L. Ed.2d 388 (1961), it has been well established that whether or not a plaintiff will be required to utilize his internal union appeals is a matter within the discretion of the trial judge. NLRB v. Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 426, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1967) (dicta); Giordani v. Upholsterers International Union, 403 F.2d 85, 88 (2d Cir. 1968). While the intent of Section 101(a) (4) is to foster union self-government, Harris v. International Longshoremen's Union, Local 1291, 321 F.2d 801, 805 (3d Cir. 1963), the provision is not meant to bar all actions prior to the four month period delimited by the law. Rather, the provision is intended to set an outer limit beyond which the federal judiciary may not withhold relief. Detroy v. AGVA, supra, 286 F.2d at 78. In appropriate circumstances, it is now well established that a district court can properly hear and decide a case before the period elapses. Operating Engineers Local 3 v. Burroughs, 417 F.2d 370 (9th Cir. 1969), cert. denied, 397 U.S. 916 (1970); Fulton Lodge No. 2, International Association of Machinists and Aerospace Workers v. Nix, 415 F.2d 212 (5th Cir. 1969).

■■ Several grounds have been found to be particularly appropriate bases for waiving the exhaustion requirement of Section 101(a) (4). When the plaintiffs will suffer irreparable harm in their jobs, Detroy v. AGVA, supra, or in the exercise of rights guaranteed to them under the LMRDA, Cefalo v. International Union of District 50 United Mine Workers of America, 311 F.Supp. 946, 953–954 (D.D.C. 1970); Sheridan

5. Section 101(a) (4) reads as follows:
"*Protection of the right to sue.*—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislature proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such *organizations* or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition."

v. Liquor Salesmen's Union, Local 2, 303 F.Supp. 999 (S.D.N.Y. 1969), courts have found the preservation of the individual interest more important than that of union autonomy. Similarly, when the internal appeals structure is inadequate or illusory, Steib v. New Orleans Clerks & Checkers Local 1497, 436 F.2d 1101 (5th Cir. 1971), or is controlled by those to whom the plaintiff is opposed, exhaustion has been deemed futile and contrary to the purposes of the LMRDA. Burke v. International Brotherhood of Boilermakers, Iron Shipbuilders, Forgers & Helpers, 417 F.2d 1063 (9th Cir. 1969); Fulton Lodge No. 2, IAMAW v. Nix, supra, 415 F.2d at 216; United Brotherhood of Carpenters and Joiners v. Brown, 343 F.2d 872, 881 (10th Cir. 1965). Finally, where the union has consistently taken a position opposed to that of the plaintiff and makes no indication that it will alter its views, there is no purpose in requiring an adjudication by the labor organization. Farowitz v. Associated Musicians of Greater New York, Local 802, 330 F.2d 999, 1002–1003 (2d Cir. 1964). In these cases, the courts are particularly solicitous when the right of free speech is at stake. Fulton Lodge No. 2, IAMAW v. Nix, supra, 415 F.2d at 217.[6]

■ All of the foregoing grounds are present in this case and fully justify the district court's refusal to require exhaustion of internal appeals before permitting judicial relief. There was considerable testimony throughout the series of hearings that the prosecutions were inhibiting the plaintiffs and others similarly situated from exercising their rights of free speech. The appeals structure gave little hope of providing the plaintiffs with an impartial forum to vindicate their rights and erase their fears. Article X, Section 10 made no provision for anyone other than the District Executive Board to hear the cases, and many members of that Board were opponents of Miners for Democracy and the insurgent movement. Even if we assume that the Executive Board's decision could have been appealed, and we have no proof of that fact, we take judicial notice that the same Miners for Democracy has opposed the re-election of International Union President W. A. "Tony" Boyle, and has intervened in a suit by the Department of Labor overturning the International's last election. Hodgson v. United Mine Workers, 51 F. R.D. 270 (D.D.C.1970), aff'd, 77 L.R.R. M., 2496 (D.C.Cir.1971), rev'd. sub nom., Trbovich v. United Mine Workers, 404 U.S. 528, 92 S.Ct. 630, 30 L.E.2d 686 (1972).

The District's opposition to plaintiffs' contentions has also been constant and clear. The repeated actions of the District, particularly the filing of the last complaint by District President Budzanoski and District Secretary-Treasurer Seddon, leave little doubt as to the District's position as to the scope and effect of Article X, Section 10. Requiring plaintiffs to spend four months seeking a determination already well-known to the court would not have sharpened the issues, fostered union self-government, or advanced the policies of the LMRDA.

Therefore, the district court properly heard the cases, and they are properly before us on appeal.

That leaves only the question of whether the district court's relief, the grant of a permanent injunction against

---

6. Of course, if a union exceeds its own powers in attempting to discipline a member, Simmons v. Avisco, Local 713, Textile Workers of America, 350 F.2d 1012 (4th Cir. 1965), or if all internal appeals available within the four month period have already been taken, Deacon v. IUOE, Local 12, 273 F.Supp. 169 (C.D. Cal.1967), it would be inequitable to require a plaintiff to wait the four month period.

However, whether any single condition or any combination of these conditions justified waiver of the four month requirement is a decision within the discretion of the trial judge, who must balance all of these factors against the expressed Congressional desire in favor of union self-government. See S.Rep. 187, 86th Cong., 1st Sess., p. 7.

any prosecutions under Article X, Section 10, was appropriate under Section 102 of the LMRDA, which provides that:

> Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. . . .

The District contends that it was error for the court to consider whether Article X, Section 10 provided a discernible standard of conduct. It argues that the fair notice requirement applicable to criminal prosecutions as an element of due process, see, e. g., United States v. Harriss, 347 U.S. 612, 618–619, 74 S.Ct. 808, 98 L.Ed. 989 (1954), is not a proper measure for assessing the propriety of a union's disciplinary provisions and proceedings. Rather, it suggests that the limits of due process to which a union can be held are delineated in Section 101(a) (5) as being: (a) served with written specific charges; (b) given a reasonable time to prepare a defense; and (c) afforded a full and fair hearing. See, e. g., Reyes v. Laborers' International Union, Local 16, 327 F.Supp. 978 (D.N.M.1971); Gleason v. Chain Service Restaurant Employees, 300 F.Supp. 1241, 1251 (S.D.N.Y. 1969), aff'd. 422 F.2d 342 (2d Cir. 1970). Therefore, the District contends that because the permanent injunction is at least partially based on this improper consideration, it is void.

It further argues that Article X, Section 10 is not in violation of Section 101(a) (5) because it provides that the only tribunal that can hear cases brought under the provision is the District Executive Board. The Board might not be seeking re-election or be otherwise engaged in the particular contest involved. Because there is the possibility that the Board would at times be neutral with respect to the parties brought before it, the District argues that the court was in error in permanently enjoining all actions under Section 10. We consider these arguments illusory and find the district court's order appropriate under Sections 101(b) and 102.

■ A short review of the history of Section 101(a) (2) sustains our conclusion that when a labor organization repeatedly utilizes a broad, ill-defined constitutional provision or by-law to harass or infringe upon its members' exercise of their protected rights of free speech, without making an attempt to limit the section to avoid conflict with the LMRDA, it is appropriate for a district court to enjoin permanently any further prosecutions under that section.

When the forerunner of the LMRDA, the Kennedy-Ives bill, S. 1555, was referred to the floor of the Senate, it had no "Bill of Rights." During the floor debate Senator McClellan, who had chaired the special Senate committee which had investigated corruption in labor unions, introduced his version of Title I. In it, he provided an absolute bar to union punishment of members who exercise their free speech rights.[7] The Senate accepted the proposal, but two days later, Senator Kuchel introduced amendments which embodied the present language of the Bill of Rights.

The new form of Section 101(a) (2) gave labor organizations three specific grounds on which they could discipline

---

7. The original McClellan amendment read:
 (2) FREEDOM OF SPEECH—
Every member of any such labor organization shall have the right to express any views, arguments, or opinions regarding any matter respecting such organization or its officers, agents, or representatives, and to disseminate such views, arguments or opinions either orally or in printed, graphic, or visual form without being subject to penalty, discipline, or interference of any kind of such organization.
 105 Cong.Rec. 5810 (April 22, 1959), reprinted in the National Labor Relations Board, Legislative History of the Labor Management Reporting and Disclosure Act of 1959 ("Leg.Hist.") 1102.

members' speech.[8] Unions could provide reasonable rules: (1) for conducting union meetings; (2) for insuring individual responsibility to the union as an institution; and (3) for preventing any interference with the union's performance of its legal or contractual obligations. Fulton Lodge No. 2, IAMAW v. Nix, supra, 415 F.2d at 217.

 Following this guide, the courts have responded by making clear that labor organizations properly exercise their disciplinary powers only over a limited area of proscribed conduct inimical to the union as an entity and collective bargaining mechanism. Unless statements fall into these categories, they are protected from union action even if libelous, Salzhandler v. Caputo, 316 F.2d 445 (2d Cir. 1963), cert. denied, 375 U.S. 946, 84 S.Ct. 344, 11 L. Ed.2d 275 (1963), or malicious, Cole v. Hall, 339 F.2d 881 (2d Cir. 1965). This court has determined that even a loosely-worded threat to a fellow union member may not at times be sufficient to justify punishment. Kelsey v. Philadelphia Local No. 8, IATSE, 419 F.2d 491 (3d Cir. 1969), cert. denied, 397 U.S. 1064, 90 S.Ct. 1501, 25 L.Ed.2d 685 (1970).

 The purpose of construing union power narrowly and the members' freedom of speech broadly is to foster truly democratic governance in labor unions. The Supreme Court has recognized that the issues involved in labor relations are sufficiently critical to justify broad protection, Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and other federal courts have long understood that:

> The democratic and free expression of opinion in any group necessarily develops disagreements and divergent opinions. Freedom of expression

would be stifled if those in power could claim that any charges against them were libelous and then proceed to discipline those responsible on a finding that the charges were false. Salzhandler v. Caputo, supra, 316 F.2d at 451.

 While it is beyond the province of the courts to scrutinize whether unions may punish members for particular behavior, International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers v. Hardeman, 401 U.S. 233, 244–245, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971), the same prohibitions do not apply to actions involving free speech, the cornerstone of all union democracy. Therefore, whenever a union member is to be disciplined for discussing the fitness of union leaders, their policies or their administration, he may claim the protection of the LMRDA's Bill of Rights. Giordani v. Upholsterers International Union, supra, 403 F.2d at 89; Farowitz v. Associated Musicians of Greater New York, supra. Further, when he seeks to invoke judicial or administrative processes guaranteed to him under the labor laws of the United States, the union cannot punish the speech involved in those appeals. NLRB v. Industrial Union of Marine and Shipbuilding Workers, supra; International Union of Operating Engineers v. Burroughs, supra.

Given the limited ambit for union control over its members' right to free speech, the actions of District # 5 suffer multiple infirmities which require remedial, judicial action.

Without considering for the moment general questions of due process, Article X, Section 10 presents a threat and obstacle to free speech because it is so vague and ill-defined that whenever a union member might exercise the right guaranteed to him under the LMRDA,

---

8. The sponsors of the new amendments sought to remedy weak drafting in the original McClellan amendment and to change key provisions with which they were in disagreement. One of those changes concerned giving unions certain rights to control the speech of their members. For the debate, see 105 Cong.Rec. 5997–6030 (April 25, 1959), reprinted in Leg.Hist. 1220–39.

he is in peril of violating the provision. In response to such a union rule, a reasonable man might well refrain from taking full advantage of his rights. The provision makes no attempt to define what conduct would constitute a violation, and there is no definitive construction for the subjective terms "dishonest and questionable." Further, Section 10 makes no attempt to relate the conduct it prohibits to the proviso in Section 101(a) (2). It gives no indication to a member as to how he should accommodate his rights and obligations under the statute.

 In other cases, it might be appropriate for a federal court sitting in equity to give consideration to the LMRDA's wish to foster internal union self-government and to refuse to grant a permanent injunction based on the vagueness of Section 10. In those instances, the proper course might be to permit the union through its decision-making process to attempt to delineate and redefine a vague provision to bring it into conformity with the dictates of Section 101(a) (2). Such a discussion would be analogous to the abstention doctrine of Railroad Comm'n. v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Alternatively, a federal court might stay its hand if the threat to free speech were merely hypothesized and had not in fact as yet materialized. See, e. g., Broomer v. Schultz, 239 F. Supp. 699, 703 (E.D.Pa.1965); aff'd. 356 F.2d 984 (3d Cir. 1966).

Neither of these mitigating conditions is present in this case.

 The construction the District has placed on Article X, Section 10 infringes on protected activity. The denunciation of the alleged ballot tampering by appellee Antal and his fellow candidates to the rest of the union and the Department of Labor must be protected if there is to be any free speech in District # 5. Not only does the subject matter of the speech directly relate to the incumbent's conduct of the organization's affairs, but also the appeal to the Government is the only way to invoke the protection of the LMRDA.[9] Penalizing such speech would discourage members from invoking their legal rights under the labor laws, and would be antithetical to the purposes of the statute. NLRB v. Industrial Union of Marine and Shipbuilding Workers, supra.

 The affidavit executed by Semancik and Pappas also cannot stand as the basis for any disciplinary proceedings permissible under Section 101(a) (2). While we have difficulty seeing how the alleged sins of the father of Michael Budzanoski reflect on the son, such statements could not be justifiably punished by the District. Comments which reflect unfavorably on union leaders do not undermine an individual's loyalty to the union as an institution. They obviously do not interfere with the performance of its contractual or legal obligations.

This court has previously recognized that language which would otherwise be characterized as extremely robust is often an accepted part of union life. Kelsey v. Local 8, IATSE, supra. Any member of Joseph Budzanoski's family might take Semancik, Pappas, Encrapera and Yablonski to state court for libel, but that is the proper forum for such redress. Such a tribunal is expert in making the difficult determinations involved in defamation cases, while union proceedings are not. The proviso to Section 101(a) (2) recognized the peculiar competence of labor tribunals to deal with matters involving collective bargaining and internal affairs. How-

9. Although the candidates of Miners for Democracy complained to the Department of Labor in advance of the actual balloting, they were seeking the aid of the Government under Section 601 of the LMRDA, 29 U.S.C. § 521. That section permits the Secretary of Labor to investigate charges of wrongdoing even in advance of the actual election. In this case, the Secretary did impound the ballots, and turned them over to the Federal Bureau of Investigation to be analyzed for tampering.

ever, it also recognized the limitations of that process. It prohibited unions from straying beyond the bounds in which they were qualified to adjudicate.

The District position appears to be that all of the conduct of the appellees was subject to the disciplinary proceedings of Article X, Section 10. They found Semancik and Pappas guilty, and therefore, presumably would also have found Encrapera and Yablonski guilty. Although the Executive Board had no opportunity to reach a final decision on the case against Antal and the other candidates of Miners for Democracy, two of the members had initiated the prosecution. All but one of the members were hostile to Miners for Democracy.

■ Union officers, including those on a District Executive Board, have a fiduciary duty under Section 501 of the LMRDA, 29 U.S.C. § 501, to insure the political rights of all members of their organization. Sabolsky v. Budzanoski, 457 F.2d 1245 (3d Cir. 1972); Johnson v. Nelson, 325 F.2d 646 (8th Cir. 1963); Retail Clerks Union, Local 648 v. Retail Clerks International Union, 299 F.Supp. 1012, 1016–17 (D.D.C.1969). They must protect not only the rights of the charging party, but also the rights of those so charged.

We might be persuaded in other circumstances that the initiation of the prosecution was not a final position by the union tribunal. However, we must evaluate the Executive Board's action in light of the two injunctions outstanding at the time of the third complaint. The Board was on notice that the district court had twice found such proceedings infringements on members' rights of free speech. We must assume that in initiating the third prosecution, the Board members truly believed that discipline for the actions alleged would not again violate the LMRDA.

The Executive Board was quite willing to permit such prosecutions in the face of the finding of the district court that they intimidated union members. Such action refutes any assertion by the Executive Board that it was discharging its fiduciary responsibilities. Such cavalier conduct fully justifies the remedial action of the district court, regardless of whatever final interpretation might be applied by the Executive Board.

Notwithstanding, the District would disagree with the remedy formulated. It argues that the court exceeded its power in granting a permanent injunction against any prosecutions under certain parts of Article X, Section 10. Rather, the District urges that courts limit themselves to granting individual injunctions on a plaintiff-by-plaintiff basis to union members who could show that their specific exercise of free speech was protected under Section 101(a) (2).

■ We disagree. Judge Weber of the district court properly exercised his equitable powers under Section 102 of the LMRDA to declare such parts of Section 10 void under Section 101(b).[10] Although our research does not disclose any prior case in which a union has been permanently enjoined from prosecuting members on the basis of their speech under a constitutional provision or by-law, such relief is within the discretion of the court.

When the Kuchel amendments to the Bill of Rights were introduced on the floor of the Senate, their supporters carefully stated that only *reasonable* union rules were to be permitted. In response to a question about who was to interpret what was reasonable or unreasonable, Senator Javits, one of the authors of the amendments replied that the matter was to be handled, as it was in all other areas of American public life, through appropriate action in the

10. Section 101(b), 29 U.S.C. § 411(b) (1970), provides:
(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

courts.[11] We interpret his statement to mean that, as in other cases involving free speech, when the provision on its face or in its application is unreasonable, it must be rendered void and of no effect. *See, e. g.,* Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

Nothing in the wording or history of Section 102 suggests a different result. This provision of the LMRDA empowers federal courts to grant whatever relief, including injunctions, which may be appropriate to protect a member's rights. Such discretionary power is to be broadly construed to effectuate the purposes of the statute, Fulton Lodge No. 2, IAMAW v. Nix, supra, 415 F.2d at 220; Gartner v. Soloner, 384 F.2d 348 (3d Cir. 1967), cert. denied, 390 U.S. 1040, 88 S.Ct. 1633, 20 L.Ed.2d 302 (1968), and other courts have implied that in different circumstances they would have declared union provisions void as unreasonable limitations on the rights guaranteed in Section 101(a) (2). Ballard v. Marine Cooks and Stewards Union, 443 F.2d 72 (9 Cir. 1971); Farowitz v. Associated Musicians of Greater New York, supra, 330 F.2d at 1002.

A union provision in conflict with Section 101(a) (4) has been held void under Section 101(b), Ryan v. International Brotherhood of Electrical Workers, 241 F.Supp. 489 (N.D.Ill.1965), aff'd. 361 F.2d 942 (7th Cir. 1966), cert. denied, 385 U.S. 935, 87 S.Ct. 296, 17 L. Ed.2d 215 (1967), and election rules contrary to the guarantees of Title IV of the LMRDA have often been held of no effect under 29 U.S.C. § 482. *See, e. g.,* Wirtz v. Hotel, Motel and Club Employees Union, Local 6, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968); Wirtz v. Local 153, Glass Bottle Blowers, 405 F.2d 176 (3d Cir. 1968).[12]

In this case, the interpretations given to the relevant part of Article X, Section 10 by the District Executive Board are as much in conflict with Section 101(a) (2) as in any other case in which provisions have been held void. The vagueness of this language might have permitted the District Executive Board to avoid such a legal confrontation. They have not, however, adopted that course. They have given no indication of doing so in the near future. Prudence suggests that when there is proof of present irreparable harm, the court

11. In construing a statute it is appropriate to look for the intent of the bill in the statements of its sponsors. Gartner v. Soloner, 384 F.2d 348, 353 (3d Cir. 1967). In this case it is Senator Javits, who in defending the Kuchel version of Section 101(a) (2), outlined the purposes and scope of judicial supervision over union rules controlling free speech:

. . . Mr. President, I say to those who talk about free speech that under the Constitution of the United States free speech is not license. Supreme Court Justice Holmes laid down the proposition long ago that it might be free speech to get up in a movie theater and to yell 'Fire', but that we could prevent it by law. What would our colleagues do? Would our colleagues have us allow a union member to get up at a union meeting and yell 'Fire'? Would our colleagues say that is free speech?—because that is what we are asked to write into the bill. That is nonsense, and we know it. Of course, all freedom has to be subject to

proper and reasonable rules of procedure.

\* \* \* \* \*

Who determines what is reasonable? That is determined by the same body which always determines such questions in American public life—the court. The courts determine whether a driver is reasonable when he hits a pedestrian. The courts determine whether somebody acted reasonably in the commission of a crime. The court determines what is reasonable every day. The court will do so in this instance. We have lodged the power where it belongs.

105 Cong.Rec. 6029 (April 25, 1959), reprinted in Leg.Hist. 1238.

12. For a discussion of the powers of a federal court under Section 402, 29 U.S.C. § 482 (1970), to hold union provisions invalid as in conflict with Title IV of the LMRDA, *see,* Note, Union Elections and the LMRDA: Thirteen Years of Use and Abuse, 81 Yale L.J. 407 (1972).

act promptly rather than rely on the possibility of future prophylactic measures.

Returning to the specific objections of appellant, we do not believe that there is any merit to the union's argument that the district court erred in considering the due process criterion of fair notice and reasonably ascertainable standards of conduct required of penal statutes. This court has previously held that traditional concepts of due process apply when assessing what constitutes a full and fair union hearing. Falcone v. Dantinne, 420 F.2d 1157, 1165 (3d Cir. 1969). The purpose of full and fair hearings is to assure that there is the "usual reasonable constitutional basis" for any action a union might take against one of its members. Boilermakers v. Hardeman, supra, 401 U.S. at 246, 91 S.Ct. 609. That goal is vitiated, and the entire reason for the proceeding undermined, when there is no fair notice of the prohibited acts. A fair hearing is not an adequate response to a charge which should never have been brought in the first place. Requiring unions to limit their prosecutions to constitutional provisions and by-laws which reasonably inform union members of the nature of the proscribed activity is a logical extension of the requirement of a full and fair hearing in accordance with due process.

It does nothing more than require a reasonable, intelligent basis for disciplinary action, "and any lesser standard would make useless Section 101(a) (5) (A)'s requirement of written, specific charges." Boilermakers v. Hardeman, supra, 401 U.S. at 246, 91 S.Ct. at 617. A requirement of specific charges serves little purpose when judged against vague, ill-defined union by-laws. Prosecutions of members in union disciplinary proceedings on the basis of such vague and uncertain provisions is repugnant to traditional concepts of due process.

This lack of a standard of conduct also makes it difficult, if not impossible, for a union member to be adequately apprised of the charges against him in order to prepare his defense. Therefore, any such prosecution fails to meet the specifically prescribed minimum due process requirements set forth in Section 101(a) (5). *Cf.* Gleason v. Chain Service Restaurant, 422 F.2d 342 (2d Cir. 1970).

Finally, we agree with the district court that the lack of an alternative forum to hear cases brought under Section 10 raises serious questions whether further proceedings under the provision would be in violation of another of the traditional due process requirements which Falcone v. Dantinne, supra, engrafted on Section 101(a) (5). A tribunal of the political opponents of those on trial offends our most basic notions of fairness. The district court determined that the Executive Board was made up of Budzanoski partisans, and unless Section 10 provided for some other group to hear these cases, there would never be the semblance of impartiality which due process requires.

The order of the district court will be affirmed.