

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-23-1999

# Ruocchio v. Local 60

Precedential or Non-Precedential:

Docket 98-6281,98-6363

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Ruocchio v. Local 60" (1999). *1999 Decisions.* Paper 160.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/160

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 23, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-6281 & 98-6363

EUGENE RUOCCHIO;
ROBERT A. D'ANGIOLILLO,
        Appellants

v.

UNITED TRANSPORTATION UNION, LOCAL 60;
DONALD J. BOGEN (Dan);
UNITED TRANSPORTATION UNION

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 97-cv-5732)
(District Court Judge: Honorable Nicholas H. Politan)

Argued: March 2, 1999

Before: STAPLETON, RENDELL, and ALDISERT,
Circuit Judges

(Filed June 23, 1999)

        Arthur L. Fox, II, Esq. (ARGUED)
        Lobel, Novins & Lamont
        1275 K Street, N.W., Suite 770
        Washington, DC 20005
         Attorney for Appellants

          Kevin C. Brodar, Esq. (ARGUED)
          United Transportation Union
          Assistant General Counsel
          14600 Detroit Avenue
          Cleveland, OH 44107
          Timothy R. Hott, Esq.
          Hott & Margolis
          591 Summit Avenue, Suite 300
          Jersey City, NJ 07306
           Attorneys for Appellees

OPINION OF THE COURT

RENDELL, Circuit Judge.

Appellants Eugene Ruocchio and Robert A. D'Angiolillo, members of the United Transportation Union ("UTU"), appeal the District Court's dismissal of their action against appellee UTU and its local chapter and chairperson. Ruocchio was suspended from his position as treasurer of the local chapter, UTU Local 60, when he was charged with "willfully circularizing untrue statements" in violation of Article 78 of the UTU constitution. Ruocchio filed suit against the UTU, Local 60, and Donald Bogen, the General Chairperson of Local 60, alleging that the charges against him violated Title I of the Labor-Management Reporting and Disclosure Act ("LMRDA"), seeking reinstatement to his position, and requesting various forms of injunctive and declaratory relief, as well as money damages and attorney's fees. The District Court, while retaining jurisdiction, determined not to proceed to entertain the action until after the union's internal procedure was complete. Although the union Trial Board found that Ruocchio had violated Article 78 and removed him from office, its ruling was overturned by the UTU's International President during the internal union appeals process and Ruocchio was reinstated as treasurer. The District Court then dismissed Ruocchio's action as moot, finding that, in light of Ruocchio's reinstatement as treasurer, no case or controversy existed. Ruocchio filed the instant appeal. We find that Ruocchio's complaint is not moot, and remand to the District Court for further proceedings in light of this opinion.

2

I.

Eugene Ruocchio and Robert A. D'Angiolillo are members
of the UTU and its local chapter, UTU Local 60. Ruocchio
also served as treasurer of Local 60, having been elected
with support from D'Angiolillo. As treasurer, Ruocchio was
responsible for depositing a refund check for overpayment
Local 60 received from Vernay Moving, Inc., a moving
company that had moved Local 60 into new offices.
Ruocchio claims that he was unable to deposit Vernay's
original refund check, dated May 28, 1997, because it was
not made out to the union, but to Local 60's secretary,
Susan Bogen, who also is the wife of Local 60's General
Chairperson, Donald Bogen. To resolve this problem,
Ruocchio requested Susan Bogen to ask Vernay to prepare
another check, this time made out to Local 60. The record
reflects that Susan Bogen did so, in a letter to Vernay dated
July 28, 1997.

Vernay sent a new check to Susan Bogen, made out to
the union, and it was forwarded to Ruocchio. On September
15, 1997, Ruocchio addressed a letter to Local 60's Vice
Chairperson Ronald B. Hicks,[1] addressing various union
financial matters, including the check from Vernay.
Ruocchio noted:

> Finally, over a month ago I had received a refund check
> from the VERNAY Company for which I returned as a
> result of it being rejected from the bank as a third
> party check. I have since received another check from
> the same company, however the amount is drastically
> reduced with no explanation. Please advise why this
> has happened and when I am to expect the additional
> monies owed to our members.

Copies of the checks issued to Susan Bogen and the union
show that the amount of both checks was the same--
$125. Thus, Ruocchio's representation that the amount of
the new check was "drastically reduced" from the prior one
was inaccurate.

_____

1. Copies of the letter were sent to "S. Padelski, L #60" and "B. Walsh,
Sec. #60." The union Trial Board noted that the letter was read at the
monthly union meeting on September 28, 1997 during Ruocchio's
treasurer's report.

3

The minutes of the September 28th meeting reflect that the inaccuracy of the representation in Ruocchio's letter was discussed, and that Ruocchio agreed to print a retraction, although no retraction was issued. In a letter dated October 14, 1997, General Chairperson Donald Bogen charged Ruocchio with a violation of Article 78 of the union constitution, which provides: "A member who willfully circularizes untrue statements shall be expelled from membership in the United Transportation Union if, after being charged and tried under the trial provisions of this Constitution, his/her guilt has been established." UTU Constitution, Art. 78, lines 1-4. Bogen, referencing the excerpt from Ruocchio's letter reproduced above, noted:

> "This statement is a lie, both checks were exactly for the same amount. . . . As you know, Susan Bogen my wife, is our office secretary and this is a direct affront to her character as she is the person who the original check was addressed to." At the next monthly union meeting, on October 26, 1997, Ruocchio was removed from office pending trial.[2] The trial was originally set for November 21, 1997.

Prior to the original trial date, in addition to appealing unsuccessfully to the union's International President for relief,[3] Ruocchio filed suit in the District Court against the UTU, Local 60, and Donald Bogen. Ruocchio alleged that Bogen had filed the charge against him in retaliation for his political opposition in the November 1996 union elections. Ruocchio averred in his complaint that:

> Ruocchio is politically opposed to the Bogan [sic] administration. He campaigned against them in the last election and ran against their hand-picked

_____

2. It appears that the formal charge was not forwarded to Ruocchio until October 31, 1997.

3. In three letters, two dated November 7, 1997, and one dated November 11, 1997, Ruocchio asked the International President for a ruling that the charge against him violated the LMRDA and the UTU constitution, and complained that the Trial Board scheduled to preside at his hearing was politically partisan and biased against him. The International President refused to intervene while the Trial Board hearing and decision were pending.

4

candidates in the previous elections; further, he has voiced his opposition to the policies of the Bogan administration.

****

Bogan and his political allies are using internal charges to punish their political opponents.

Complaint, PP 10, 13. Additionally, Ruocchio elaborated on his allegations in a second affidavit, filed about two months after the complaint was filed:

In the last officer elections conducted by UTU Local 60 in November of 1996, I ran on a slate running in opposition to the slate supported by the Local's principal officer, General Chairman Don Bogen, who considers me to be his arch political enemy -- the proverbial camel who got its nose under Bogen's tent.

****

For whatever reasons, Don Bogen reportedly took great umbrage, perhaps because my question concerning the Vernay reimbursement allegedly constituted "a direct affront to [his wife's] character," . . . but more likely because he was hunting for some excuse to remove a "dissident" from his Executive Board otherwise comprised of loyalists or people he can control one way or another.

In any event, the very first notice I had that my simple, honestly intended question had caused a political aneurysm was when, at the next general membership meeting on October 26, 1997, I was brought up on internal union charges, effectively tried before those members who happened to be in attendance, and removed from the office to which I had been elected by the entire membership. In essence, I was caught totally off balance by Bogen and his lynch mob. I now understand that the event had been carefully scripted for the purpose of eliminating a political opponent.

Second Affidavit of Eugene Ruocchio, PP 2, 8-9 (alteration in original).

5

Ruocchio's complaint alleged various violations of Title I of the LMRDA, 29 U.S.C. S 411. Ruocchio claimed that defendants violated his right to free speech under S 411(a)(2) of the Act,4 and that his suspension from office pending trial violated S 411(a)(5), which provides that members will be afforded certain procedural safeguards before being "fined, suspended, expelled, or otherwise disciplined."5 D'Angiolillo alleged that Ruocchio's removal

_____

4. Section 411(a)(2) provides:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein
> shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every
> member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of
> its legal or contractual obligations.

5. We note that Ruocchio's S 411(a)(5) claim is not cognizable, since it is based on removal from office, not membership. In Sheridan v. United Brotherhood of Carpenters & Joiners of America, Local No. 626, 306 F.2d 152 (3d Cir. 1962), this Court held that removal from office did not constitute a form of discipline as that term was used in S 529 of Title 29. See id. at 156. Section 529 provides that "[i]t shall be unlawful for any labor organization . . . to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of [the LMRDA]." 29 U.S.C. S 529. We reached this conclusion because we understood S 529's enumeration offine, suspension, and expulsion to "manifest an intention by Congress to protect members qua members. Removal from office, on the other hand, is a sanction that can be directed only against the limited group of members who happen to be officers." Sheridan, 306 F.2d at 156. Thus, we concluded that the plaintiff could not state a violation of S 529 based on his removal from office. Furthermore, we concluded that S 411 did not protect the plaintiff 's status as an officer since the Bill of Rights contained therein repeatedly refers to the rights of members, not to the rights of officers or employees. See id.

In subsequent cases, we have held that S 411(a)(5) protects the union-member relationship, not the union-officer or union-employee

6

from office had deprived D'Angiolillo, who had voted for Ruocchio as treasurer, of his right to participate in the governance of the local union through a duly elected representative and spokesperson in violation ofS 411(a)(1).6

In addition to a request for money damages to compensate for loss due to Ruocchio's alleged improper removal, and for attorney's fees, plaintiffs also sought various forms of injunctive and declaratory relief. Ruocchio requested an injunction barring defendants from going forward with the trial against him, and reinstating him to his position as treasurer. The complaint also requested 1) declaratory relief that Article 78 is null and void; and 2) injunctive relief not only enjoining defendants from enforcing Article 78 and requiring they notify union members that Article 78 is no longer in force, but also enjoining defendants from retaliating against union members for exercising their rights under Title I of the LMRDA.

Prior to the union trial, which had been postponed from the originally scheduled November date, the District Court

_____

relationship -- both because of Sheridan's specific holding regarding S 411 as a whole and because of the parallel language in S 411(a)(5) and S 529. See Martire v. Laborers' Local Union 1058, 410 F.2d 32, 35 (3d Cir. 1969) (holding that S 411(a)(5) did not afford a remedy for removal from office prior to expiration of term); Harrison v. Local 54 of the Am. Fed'n of State, County & Mun. Employees, 518 F.2d 1276, 1281 (3d Cir. 1975) (noting that the LMRDA does not provide relief for removal from office or for loss of income resulting therefrom).

6. Only two charges listed in the "Causes of Action" section of the complaint refer specifically to D'Angiolillo: theS 411(a)(1) charge, and the
S 411(a)(2) charge that Article 78 "infringes and chills the exercise of plaintiffs' free speech rights." The complaint's prayer for relief does not
specify what, if any, relief D'Angiolillo is seeking; in fact, in requesting
relief, it refers to "plaintiff " in the singular. We assume that D'Angiolillo
intended that his claims be remedied by Ruocchio's reinstatement, and the other equitable and declaratory relief sought by Ruocchio as "plaintiff." We therefore discuss the relief that Ruocchio seeks, and do not address separately any relief sought by D'Angiolillo. This does not mean that D'Angiolillo could not seek to clarify his position in this regard
on remand to the District Court.

7

heard oral argument on Ruocchio's application for a preliminary injunction, but granted defendants' motion to dismiss the application, while retaining jurisdiction over the matter pending the outcome of the internal union trial. The Court explained that it would "not interfere with the internal workings of the Union at this point in time." Nonetheless, the Court noted: "Though not making a determination one way or the other at this time, the Court is compelled to note that it has serious reservations as to the validity of Article 78."

The union trial was held on March 30, 1998, and, on April 10, 1998, the Trial Board ruled that Ruocchio had violated Article 78. On May 30, 1998, Ruocchio appealed this decision to the International President, who overturned the Trial Board and reinstated Ruocchio to his position as treasurer, stating:

> I have carefully reviewed the trial transcript, exhibits, and your appeal letter. After such review I have determined that the trial board failed to focus on charges brought and that the record as a whole does not present a violation of any willful circulization of untrue statements as contemplated by Article 78.

On July 13, 1998, in a letter addressed to Bogen (of which Ruocchio and other union officials received copies), the International President explained that, in overturning the Board's decision, he had not judged the propriety of Ruocchio's conduct, but had simply concluded that there was insufficient evidence of "willful" conduct on Ruocchio's part.[7]

_____

7. The letter provided, in relevant part:

> In considering the appeal, I am duty bound to focus on the precise charge brought, and particularly upon the "willfully" standard stated in Article 78 of the Constitution, especially where, as here, the free speech rights contained in Title I of the LMRDA limit application of Article 78 to narrow circumstances similar to the limitations the First Amendment to the U.S. Constitution places on defamation actions in some circumstances. In short, there was insufficient evidence of record that the clearly erroneous statement in the letter that was the focus of the charge made against Mr. Ruocchio had

8

Shortly thereafter, plaintiffs filed a renewed motion for a preliminary injunction and a motion for summary judgment before the District Court. On July 8, 1998, the District Court dismissed the complaint, finding that there was no case or controversy due to Ruocchio's reinstatement to his position as treasurer. Ruocchio filed a motion for reconsideration, which was denied on July 30, 1998. The District Court also denied Ruocchio's request for attorney's fees by letter order dated September 9, 1998, on the basis that Ruocchio was not a prevailing party in the litigation. The instant appeal followed.

We base our jurisdiction on 28 U.S.C. S 1291, which allows us to review final orders of the district courts. The District Court had jurisdiction over this matter pursuant to 28 U.S.C. S 1331. Our review of the District Court's determination that Ruocchio's action was moot is plenary. See International Bhd. of Boilermakers v. Kelly, 815 F.2d 912, 914 (3d Cir. 1987).8

_____

        been made "willfully" as the courts would apply that term. I have
no
        criticism of the action of the Trial Board in hearing this matter
and
        making the determination they did. It was just a question of my
        obligation to construe our Constitution to make sure that its text
        and application would remain within the difficult boundaries of
        federal law.

8. The plenary standard of review seems appropriate since mootness doctrine relates to courts' constitutional authority to hear a case; a court must dismiss a case as moot if there is no Article III case or controversy.
However, mootness analysis often encompasses prudential considerations, in addition to the threshold constitutional dimension, that could be more appropriately reviewed for abuse of discretion. See Kelly, 815 F.2d at 915; see also In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996) (reviewing a mootness determination in the bankruptcy context for abuse of discretion, because it involved a discretionary balancing of equitable and prudential factors, rather than the limits of the federal courts' authority under Article III). In practice, courts frequently do not parse the two. See Kelly, 815 F.2d at 915. The District Court, while not specifically grounding its decision on the constitutional aspect of the mootness doctrine, noted that it was dismissing the case because "no case or controversy exists." Thus, it seems the plenary standard of review is particularly appropriate here, where the District Court has appeared to rely solely on constitutional grounds.

II.

Although the precise issue before us relates to mootness of the instant dispute, and whether plaintiff is entitled to relief, the issue is best couched in the following terms for our purposes: whether the decision of the dispute continues to be justified by sufficient prospect that it will have impact on the parties. See 13A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE S 3533, at 212 (1984). We conclude that, in light of the unique considerations involved in the union speech context, and the facts averred in this case, it is likely that a decision in the case will impact the parties notwithstanding Ruocchio's reinstatement. We will therefore remand to the District Court for a determination of the claims that should be decided, in light of this opinion.

As indicated above, plaintiff sought several types of relief: money damages; attorney's fees; a declaration that Article 78 is null and void; and injunctive relief, enjoining defendants from enforcing Article 78, requiring defendants to provide notice to union members that Article 78 is unenforceable, and prohibiting defendants from retaliating against union members in violation of their rights under Title I of the LMRDA.[9] The District Court held that the reinstatement rendered the entire case moot. However, a case may be moot as to one remedy, but not as to others.

Here there can be no question that Ruocchio's claim for monetary damages survives and is not moot. See Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 354–55 (1989) (holding that an officer had stated a cause of action under S 411(a)(2) because retaliatory removal from office constituted a price paid for the exercise of his membership right of free speech). The District Court never addressed this claim, but we hold that on this basis alone the District Court must hear the case to determine Ruocchio's entitlement to damages. The question as to whether

_____

9. Plaintiffs also requested injunctive relief prohibiting the union trial from going forward, and reinstating Ruocchio to his position as treasurer. These claims for relief are clearly moot, in light of the fact that the union trial has already taken place, and that Ruocchio has already been reinstated.

10

plaintiff continues to have a claim for declaratory and injunctive relief is a closer one. However, based on the allegations of plaintiff's complaint and his affidavit in this case, we have little difficulty in finding that these claims, too, are very much alive, and have not been rendered moot by Ruocchio's reinstatement. Ruocchio's complaint paints a picture of the union employing a provision of its constitution to silence speech in opposition to the union leadership. The entire check incident is averred to have been employed as a device to punish Ruocchio for his vocal support of others. Whether or not the union's International President ultimately reinstated Ruocchio to his office, his complaint is based on retaliation for speech protected by the LMRDA, and we view our decisions in Mallick v. International Brotherhood of Electrical Workers, 644 F.2d 228 (3d Cir. 1981) and Semancik v. United Mine Workers of America District # 5, 466 F.2d 144 (3d Cir. 1972) as requiring that his claim for declaratory and injunctive relief be heard. We will also remand the decision regarding plaintiffs' entitlement to attorney's fees for further consideration.

III.

This appeal presents a situation in which First Amendment principles intersect with concerns particular to union speech issues in a way that has, historically, caused Congress and the federal courts to proceed with special care. Congress's commitment to providing special protection for free speech rights in the union context is illustrated by Title I of the LMRDA, commonly referred to as the LMRDA's "Bill of Rights." The courts have played a significant role in defining the contours of the LMRDA's speech provisions, and have "shaped the Bill of Rights into a guarantee of union democracy, with the right of free speech enjoying a particularly favored position." Fulton Lodge No. 2 of the Int'l Ass'n of Machinists & Aerospace Workers v. Nix, 415 F.2d 212, 217 (5th Cir. 1969). In construing its terms, the Supreme Court has considered that the predecessor to the LMRDA's current Bill of Rights was adopted as an amendment on the Senate floor by legislators who "feared that the bill did not go far enough

11

because it did not provide general protection to union members who spoke out against the union leadership." United Steelworkers of Am. v. Sadlowski, 457 U.S. 102, 109 (1982); see also Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 352 (1989). The Court concluded that the legislative history revealed that Title I of the LMRDA was modeled after the Constitution's Bill of Rights, and was intended "to restate a principal First Amendment value -- the right to speak one's mind without fear of reprisal." Sadlowski, 457 U.S. at 111 (finding, however, that the scope of S 411(a)(2) of the LMRDA is not identical to the scope of the First Amendment).

Violations of rights guaranteed by the LMRDA are of particular concern because discipline of one union member based on such a violation may deter other members from exercising their rights, thereby threatening the rights of all union members. See Hall v. Cole, 412 U.S. 1, 8 (1973). In Hall, the Court determined that courts had authority to award attorney's fees to successful LMRDA plaintiffs, observing that, "by vindicating his own right, the successful litigant dispels the `chill' cast upon the rights of others." Id. at 8-9, 14. As the Second Circuit Court of Appeals noted in Salzhandler v. Caputo, 316 F.2d 445 (2d Cir. 1963):

> The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain.

Id. at 448-49. Salzhandler held that the protection afforded by the LMRDA was so broad that even libelous speech was protected. See id. at 450-51 (holding that libelous speech that may be the basis for a civil action may not be the basis for union discipline, because union "procedure is peculiarly unsuited for drawing the fine line between criticism and defamation"); see also Gertz v. Welch, 418 U.S. 323, 347 (1974) (finding, in the First Amendment context, that states may not impose liability for false and defamatory speech

12

absent a showing of fault).10 Courts have also held that the LMRDA provides them with broad discretion to fashion appropriate relief for LMRDA violations. See Gartner v. Soloner, 384 F.2d 348, 354–56 (3d Cir. 1967) (discussing courts' broad remedial power under the LMRDA, in determining that attorney's fees may be awarded under the statute).

Further, in light of the above concerns, courts have been expansive in their view of a litigant's standing to bring legal action in situations in which free speech rights are implicated. Cases addressing issues of standing in the free speech labor context –– which mirror the same concerns that exist regarding mootness –– have recognized that limitations on free speech rights can result in a"chilling effect" on others' exercise of those rights, and have taken a broad view of standing based on this prospect.11 In Nelson v. International Association of Bridge, Structural & Ornamental Iron Workers, 680 F. Supp. 16 (D.D.C. 1988),

_____

10. The dissent cites Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 63 (1966), for the proposition that libelous statements of union members are not protected from union action. Although there is language in Linn suggesting that unions should adopt procedures proscribing libelous speech, Linn ultimately dealt with a civil action against libelous speech, not union action against libelous speech. See id. at 55. As noted above, Salzhandler distinguished between the two, finding that speech that may be the basis of a civil action might not be an appropriate basis for union action. See Salzhandler, 316 F.2d at 450–51. Thus, Linn is not inconsistent with Salzhandler's conclusion that unions may not proscribe libelous speech.

11. Cases addressing standing are relevant to our inquiry because the question of standing "bears close affinity" to the question of mootness. See Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975). Both standing and mootness involve the consideration of whether an Article III case or controversy exists. See id. at 498; Kelly, 815 F.2d at 914. In dismissing the instant case, the District Court equated mootness with the absence of a case or controversy. Mootness has been described as representing "a time dimension of standing, requiring that the interests originally sufficient to confer standing persist throughout the suit." WRIGHT ET AL., supra, S 3533.1, at 220. We adopted a similar view in Artway v. Attorney General, 81 F.3d 1235 (3d Cir. 1996), in which we explained that mootness "asks whether a party who has established standing has now lost it because the facts of her case have changed over time." Id. at 1246.

13

the court looked to the First Amendment overbreadth doctrine in determining if plaintiffs had standing to challenge a union provision as violative of the LMRDA. See id. at 24. One of the plaintiffs had not even been charged under the provision, and simply alleged that his own interpretation of the broad provision induced him to remain silent. See id. at 23. Nonetheless, the court explained that, under the relaxed rules of standing applied in this context:

> Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the Court to refrain from constitutionally protected speech or expression.

Id. at 24 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973)). The court concluded that the plaintiffs had standing to challenge the section of the union constitution, because it was so "grossly overbroad," and"so plainly" violated the LMRDA that " `no judicial prediction or assumption' is necessary to ascertain that free speech will be chilled," and denying plaintiffs standing would perpetuate the chilling effect on the rights of all union members. Id. at 25; see also Virginia v. American Booksellers Ass'n, 484 U.S. 383, 393 (1988) (plaintiffs had standing to raise a facial challenge to an allegedly speech-infringing statute before the statute had been enforced because they had alleged "an actual and well-founded fear" that the statute would be enforced against them, and"the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution").12

We have had occasion to endorse this expansive view of union speech rights, in Mallick v. International Brotherhood of Electrical Workers, 644 F.2d 228 (3d Cir. 1981) and

_____

12. The dissent characterizes plaintiff 's claim arising from the application of Article 78 to him as an "abstract" injury, rather than one that is "distinct" and "palpable." We submit, however, that in the context of union speech, a claim that rights have been chilled has been deemed anything but abstract. See Mallick v. International Bhd. of Elec. Workers, 644 F.2d at 235.

14

Semancik v. United Mine Workers of America District # 5, 466 F.2d 144 (3d Cir. 1972). In Mallick, plaintiff union members were "vocal and persistent critics" of union leadership who were charged with violating various provisions of the union constitution, including provisions similar to the one at issue in this case. See Mallick, 644 F.2d at 230-32. The provisions made punishable: "[p]ublishing or circulating among the membership, or among [local unions] false reports or misrepresentations," and "[s]landering or otherwise wronging a member of the [union] by any willful act or acts." Id. at 231 n.1. The penalties assessed for violations of these particular provisions were eventually reversed by the union's international representative, due to insufficient evidence that the statements at issue were untrue, much like the charges were reversed in the instant case. See id. at 232 & n.5. In addition to compensatory and punitive damages, plaintiffs sought declaratory and injunctive relief barring enforcement of the allegedly illegal union provisions under which they had been charged. See id. at 232. The district court determined that plaintiff union members lacked standing to challenge the validity of union provisions that formed the basis for charges that had been overturned by the international representative. See id. at 233. We reversed. See id. at 236.

In holding that the district court erred in failing to consider plaintiffs' equitable claims based on these charges, we noted the "expansive protection" given to union members' speech rights. See id. at 235 ("The Bill of Rights section of the [LMRDA] is designed to foster democratic governance within labor unions, and to encourage members freely to dissent from the policies and administration of the leadership or to discuss openly those policies and practices."). Had the district court properly considered the broad protections afforded to speech under the LMRDA, and the unique nature of speech infringements, it would not have concluded that, because the charges were overturned on appeal, plaintiffs necessarily did not suffer an actionable injury. See id.

> Harm to free speech rights . . . is not measured solely
> in economic terms, nor must concrete punishment be

15

> meted out to confer standing to sue. The right to speak
> one's views freely is so fundamental that the spectre of
> punishment, or the uncertainty created by a vaguely
> worded prohibition of speech, is injurious as well.

Id. We noted that the mere fact that the members were charged, as well as the possibility of future charges based on the challenged prohibitions, could have a substantial chilling effect on plaintiffs' and other union members' exercise of their free speech rights: "The goal of union democracy, achieved through the expression of opposing viewpoints, would be difficult to realize if members felt deterred from expressing their opinions by the prospect of disciplinary proceedings." Id. at 236. Accordingly, we remanded for the district court to consider whether the provisions at issue violated S 411 of the LMRDA. See id.13

In Semancik, we recognized the district courts' broad discretion to fashion remedies for speech violations in the union context, and determined that the district court properly entered a permanent injunction prohibiting enforcement of a union provision that violated the LMRDA, because the union provision was broad and ill-defined, and had been repeatedly utilized to stifle protected speech. See Semancik, 466 F.2d at 152-53, 156. In so doing, we rejected the defendants' argument that the district court was limited to granting individual injunctions on a case-by-case basis to union members who could show that their speech rights had been violated. We concluded that under S 412 of the LMRDA the district court's power to grant relief was not so circumscribed, and that S 412 afforded district courts the discretion to fashion whatever relief was appropriate to protect union members' rights, including injunctions. See id. at 155-56. We specifically stated that courts' "discretionary power is to be broadly construed to effectuate the purposes of the statute." Id. at 156. This provision, coupled with S 411(b) of the LMRDA, which

_____

13. While our dissenting colleague seeks to distinguish Mallick based on the actual injury in that case, our focus in Mallick was not on the extent of union reprisal but, rather, on the harm visited in non-economic terms via the chill on, and deterrence of, the right of expression. See Mallick, 644 F.2d at 235-36.

16

provides that union provisions in violation of the LMRDA shall be "of no force or effect," empowered the district court to enjoin permanently a union provision violative of the LMRDA. See id. at 155-56. Once again, we took into account the important consideration that union power is subject to restrictions in the face of the members' competing freedom of speech claim. See id. at 153 ("[C]ourts have responded by making clear that labor organizations properly exercise their disciplinary powers only over a limited area of proscribed conduct inimical to the union as an entity and collective bargaining mechanism. Unless statements fall into these categories, they are protected from union action even if libelous.").

Both Mallick and Semancik illustrate the broad protection the LMRDA affords speech rights in the union context, and demonstrate that we may view the harm caused by regulation of such speech somewhat differently from the harm or injury occurring in other contexts. Both cases also reflect the wide discretion granted to district courts so that they may fashion remedies that satisfy these concerns. These factors are present in the instant case, and lead us to the same conclusion that we reached in Mallick -- that the District Court should have considered whether equitable and declaratory relief was appropriate. Ruocchio's reinstatement and the reversal of the charges against him no more automatically foreclose his rights to additional relief than the reversal of the charges did in Mallick; the remedies sought by Ruocchio of an injunction against enforcement of the constitutional provision, and declaration of its invalidity, may indeed retain sufficient utility to justify their implementation. In both of these cases, we reiterated in broad and expansive terms the need for the courts to entertain, and enjoin, union exercise of power that chills speech protected by the LMRDA. To conclude, as the dissent does, that these important rulings do not support our conclusion is to turn our jurisprudence on its head.

Our dissenting colleague urges that our ruling opens the flood gates to union members' protests against valid union regulation based upon the "sole" "bald" allegation that their speech has been "chilled." Rather than take issue with this view, we embrace this characterization as a fair statement

17

of what the law requires. Our jurisprudence compels us to give a union member the opportunity to protect his right to speak his views as legislatively mandated by S 411(a)(2) of the LMRDA. In so doing we suggest that the harm it seeks to avoid is very real, and the power it seeks to curtail can be wielded in ways not apparent on the face of a union constitution. See Mallick, 644 F.2d at 235; Semancik, 466 F.2d at 152.

We do not decide whether Ruocchio is entitled to declaratory and injunctive relief; we hold only that the claims do have vitality before the District Court. We note that by determining that these claims for relief are not moot, we have addressed the simplest part of the equation. Determining whether the conduct of the union actors, and/or the challenged constitutional provision itself, violate S 411(a)(2) of the LMRDA and, if so, what relief should be provided, are far more complicated inquiries. As this case was dismissed without the aid of any discovery, we cannot begin to address these issues and must entrust them to the District Court for resolution on remand.

We will also vacate the District Court's ruling denying plaintiffs' request for attorney's fees. To recover attorney's fees under the LMRDA, a claimant must be a prevailing party and his lawsuit must provide a common benefit to all union members. See Pawlak v. Greenawalt, 713 F.2d 972, 980 (3d Cir. 1983). The District Court found that Ruocchio could not recover attorney's fees because he did not technically prevail in the case before it. We view this decision as reflecting an inadequate inquiry into the factors set forth in Pawlak. On remand, the District Court will necessarily revisit its ruling based on the outcome of the monetary, equitable, and declaratory claims for relief it will now hear as discussed above, and in doing so, should reconsider the Pawlak factors. We note that, for purposes of Pawlak's "prevailing party" requirement, Ruocchio need not obtain ultimate success in the form of a judgment in order to be entitled to attorney's fees. See Baumgartner v. Harrisburg Housing Auth., 21 F.3d 541, 544 (3d Cir. 1994); Brennan v. United Steelworkers of Am., 554 F.2d 586, 591 n.5 (3d Cir. 1977). Rather, if plaintiffs have been a "catalyst," so that defendants voluntarily ceased the

18

behavior challenged by plaintiffs, plaintiffs can still be "prevailing parties" if they prove that the lawsuit was a material contributing factor in bringing about the desired relief. See Baumgartner, 21 F.3d at 544-45 (citing Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128, 132 (3d Cir. 1991)); see also Riley v. McCarthy, 723 F. Supp. 1521, 1522 (D.D.C. 1989) (finding that an LMRDA plaintiff is a "prevailing party" even absent judgment on the merits as long as the lawsuit was not frivolous, the plaintiff substantially obtained the relief sought, and the lawsuit was an important factor in obtaining that relief). Further, plaintiffs may satisfy Pawlak's common benefit requirement if, by vindicating their rights under the LMRDA, they have "dispelled the `chill' cast upon the rights of all Union members and contributed to the preservation of union democracy." Pawlak, 713 F.2d at 980.

IV.

For all of the foregoing reasons, we will reverse the District Court's determination that plaintiffs' lawsuit was moot, vacate the District Court's denial of attorney's fees, and remand to the District Court for proceedings consistent with this opinion.

19

ALDISERT, Circuit Judge, dissenting.

The Supreme Court has consistently made clear that lies and willful defamation are not shielded by the expansive reach of the First Amendment. Yet, the majority suggests that a provision of a union constitution, which prohibits this same type of defamation, creates a chilling effect on speech sufficient to create a justiciable controversy in a case pursuant to the Labor-Management Reporting and Disclosure Act ("LMRDA"). This conclusion is unacceptable to me. I dissent.

This appeal requires us to decide whether the district court erred by dismissing Appellants' claims as moot after Eugene Ruocchio was reinstated to the office of treasurer of United Transportation Local #60 on June 10, 1998. Ruocchio was first suspended from that office on October 27, 1997, pending a trial board hearing on a charge that he violated Article 78 of the Union Constitution, and was removed from office on April 10, 1998 after the board found him guilty. Article 78 provides:

> A member who willfully circularizes untrue statements shall be expelled from membership in the United Transportation Union if, after being charged and tried under the trial provisions of this Constitution, his/her guilt has been established.

App. at 39. Notwithstanding the mootness issue, critical to our ultimate decision is whether the mere accusation that a union member has violated Article 78, without proof that the member has been damaged by the accusation, is such an injury as to make out a justiciable case or controversy as a violation of the LMRDA, specifically 29 U.S.C. S 411(a)(2). The majority believes that an accusation is sufficient. I am unable to agree because, in my view, Appellants no longer have a case or controversy vesting the district court with jurisdiction. Accordingly, for reasons related to those expressed by the district court but with a somewhat different emphasis on the doctrine of justiciability, I would affirm the judgment of the district court.

20

I.

Article III of the Constitution confines the judicial power by extending it only to cases and controversies." `All of the doctrines that cluster about Article III--not only standing but mootness, ripeness, political question, and the like-- relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.' " Allen v. Wright, 468 U.S. 737, 750 (1984) (quoting Vander Jagt v. O'Neill, 699 F.2d 1166, 1178-1179 (D.C. Cir. 1982) (Bork, J., concurring)).

As early as 1937, the Court made clear that a genuine case or controversy is necessary for the federal courts to grant relief to litigants. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239-240 (1937) (interpreting the Declaratory Judgment Act). The court enunciated precepts that define "case or controversy":

> A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantive controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what a law would be upon a hypothetical state of facts.

Id. at 240-241 (citations omitted).

Thus, Article III requires a party seeking relief to allege personal injury that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982). The injury alleged must be distinct and palpable, Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979), and not "abstract" or "conjectural" or "hypothetical," City of Los Angeles v. Lyons,

21

461 U.S. 95, 101-102 (1983); O'Shea v. Littleton, 414 U.S. 488, 494 (1974). In the absence of such an injury, the requirements of Article III are not satisfied and the district court does not have jurisdiction to entertain the action before it.

II.

As a threshold consideration, Appellants cannot breathe justiciability into their law suit by claiming economic injury from Ruocchio's suspension, removal and subsequent reinstatement as treasurer of the local union. The complaint's allegations relating to monetary damages are grounded on Ruocchio's suspension as an officer of the union, not as a member. We have held that "the LMRDA does not provide relief to a union officer for suspension as an officer, nor for loss of income resulting therefrom." Harrison v. Local 54 of Amer. Fed'n of State, County & Mun. Employees, AFL-CIO, 518 F.2d 1276, 1281 (3d Cir. 1975). See also Martire v. Laborers' Local Union 1058, 410 F.2d 32, 35 (3d Cir. 1969) ("In Sheridan v. United Brotherhood of Carpenters, 306 F.2d 152 ([3d Cir.] 1962) we held that . . . Title I of the LMRDA . . . [does not] afford[ ] a remedy to a business agent of a union who has been removed from his elected office prior to the expiration of his term, for the reason that `[i]t is the union-member relationship, not the union-officer or union-employee relationship, that is protected.' ").

III.

The majority believes that an amorphous "chilling effect" of Article 78 on Appellants' speech is sufficient to confer standing such that a justiciable controversy exists and in so doing, makes an assumption that standing in a First Amendment case is co-extensive with standing in a S 411(a)(2) claim. Although courts have looked to First Amendment cases for guidance in S 411(a)(2) cases, it is clear that the two are not co-extensive. United Steelworkers of America v. Sadlowski, 457 U.S. 102, 111 (1982) ("However, there is absolutely no indication that Congress intended the scope of S 101(a)(2) to be identical to the scope

22

of the First Amendment. Rather, Congress' decision to include a proviso covering `reasonable' rules refutes that proposition."). Because the First Amendment provides broader protection of speech rights, there is no reason to assume that standing requirements in S 411(a)(2) cases are equivalent to those required to seek First Amendment relief. Indeed, ruling case law indicates that the exact reverse is true.

Notwithstanding the slightly broader concepts of standing in a First Amendment context, there are clear limits to what non-economic injury is sufficient to confer standing in a complaint brought under S 411(a)(2). Section 411(a)(2) itself provides one such limit:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. S 411(a)(2) (emphasis added). The legislative history indicates that the provision that

> preserves the union's right to adopt reasonable rules governing the responsibilities of its members . . . was designed to remove "the extremes raised by the [freedom of speech and assembly provisions]" . . . and to assure that the amendment would not "unduly harass and obstruct legitimate unionism."

United Steelworkers of America, 457 U.S. at 110 (quoting 105 Cong. Rec. 6721, 6722 (1959) (statements of Sen. Cooper and Sen. Church)). Thus, we must determine whether Article 78 qualifies as one of the permitted

23

"reasonable rules" under S 411(a)(2). If it is a reasonable rule, there is no justiciable controversy in this case.

A.

"Congress adopted the freedom of speech and assembly provision [of the LMRDA] in order to promote union democracy." Id. at 112. To understand the breadth of union democracy, we must ascertain the limitations to speech in the broader community in which we live, under a political democracy. Because the First Amendment provides greater protection for speech, any limitation of its protection applies a fortiori to the protections ofS 411(a)(2).

Even under the broader limitations of the First Amendment, our speech is restricted by the law of defamation and the criminal statutes that proscribe or punish lying under oath. The law of defamation, for example, imposes liability for any statement that"asserts or implies a statement of fact which is damaging to reputation." Sedore v. Recorder Publishing Co., 716 A.2d 1196, 1200 (N.J. Super. Ct. App. Div. 1998); see also Sisler v. Gannett Co., Inc., 516 A.2d 1083, 1086-1088 (N.J. 1986) (discussing cases that "attempt to pacify the warring interests of free speech and individual reputation"). Numerous state and federal laws prohibit the making of false statements under oath, "under penalty" or to law enforcement officers. See, e.g., 18 U.S.C. S 1621 (perjury); 18 U.S.C. S 1623 (false declarations before grand jury or court); N.J. Stat. Ann. S 2C:28-1 (perjury); N.J. Stat. Ann. S 2C:28-2 (false swearing); N.J. Stat. Ann. S 2C:28-3 (unsworn falsification to authorities); N.J. Stat. Ann. S 2C:28-4 (false reports to law enforcement authorities).

Whatever have been the recent efforts in some quarters to denigrate the importance of telling the truth, society still places a premium on truth-telling and a penalty for violating the precepts prohibiting lying under oath. Even the President of the United States is not immune from such penalties. See Jones v. Clinton, 36 F. Supp.2d 1118, 1130, 1131 (E.D. Ark. 1999) (adjudging the President to be in civil contempt because his "deposition testimony regarding whether he had ever been alone with Ms. Lewinsky was

24

intentionally false, and his statements regarding whether he had ever engaged in sexual relations with Ms. Lewinsky likewise were intentionally false, notwithstanding tortured definitions and interpretations of the term `sexual relations.' ").

Deliberately telling a lie or circularizing an untruth in the general community is neither protected nor acceptable in our society:

> [T]he use of the known lie as a [political] tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. . . . [T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.

Garrison v. State of Louisiana, 379 U.S. 64, 75 (1964). Even in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), and its progeny in actions against public officials, the First Amendment does not shield the publication of defamatory falsehood made " `with actual malice'--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 280.

B.

In the context of Article 78, "willfully," in the sense of intentionally or knowingly, is equivalent to the "actual malice" definition in New York Times Co. v. Sullivan. Because the First Amendment does not insulate a public official from making a statement with knowledge that it is false, there can be no doubt that S 411(a)(2) does not protect a union member from the consequences of his own willful circularization of untrue statements. Thus, a union rule restricting this practice cannot be considered unreasonable. Cf. Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 55 (1966) (determining that, in the context of national labor policy, a district court has jurisdiction to entertain a civil action for libel instituted under state law by a party to a labor dispute).

The fundamental purpose of labor unions also supports the reasonableness of Article 78. Implicit in all phases of

25

labor organizations is the hallowed workers' proclamation "In union there is strength." The keystone of our national labor policy was articulated in the National Labor Relations Act of July 5, 1935, ch. 372, S 1, 49 Stat. 449 (the "Wagner Labor Act"), and repeated verbatim in the Labor Management Relations Act, 1947, 29 U.S.C. S 141 et seq.:

> It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.14

29 U.S.C. S 151. The Wagner Labor Act also stated:

> The inequality of bargaining power between employees who do not possess full freedom of association or

_____

14. National labor policy was first announced in the National Industrial Recovery Act of 1933:

> Sec.7. (a) Every code of fair competition, agreement, and license approved, prescribed, or issued under this title shall contain the following conditions:  (1) That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or
> coercion of employers of labor, or their agents, in the designation of
> such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid
> or protection; (2) that no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing; and (3) that employers shall comply with the maximum hours of labor, minimum rates of pay, and other conditions of employment, approved or prescribed by the President.

National Industrial Recovery Act of 1933, ch. 90,S 7(a), 48 Stat.195, 198 (1933) (held invalid by A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495 (1935)).

actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects theflow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wages rates and working conditions within and between industries.

Ch. 372, S 1, 49 Stat. 449. Finally, the Labor Management Relations Act states:

Experience has proved that protection by law of the right of employees to organize and bargain collectively . . . restor[es] equality of bargaining power between employers and employees.

29 U.S.C. S 151. Thus, we must recognize that the fundamental purpose of the United Transportation Union Local #60 was to permit members to organize and bargain collectively for terms and conditions of employment in order to offset the economic, social and political power of employers.

In sensitive collective bargaining with employers and in processing grievances, the unified front of the union is of paramount importance. It is therefore a desirable objective to promote harmony and minimize acrimony within the ranks. A union is not an academic debating society; it is a formal democratic association of fellow workers founded to implement the "practice and procedure of collective bargaining." 29 U.S.C. S 151; Wagner Labor Act, ch. 372, S 1, 47 Stat. 449.

The prohibition of the commission of deliberate falsehoods by one union member against another helps to insure maximum harmony and thus to produce unity within the union. It serves the salutary purpose of minimizing dissension, disharmony and internal conflict within a labor organization whose effectiveness in bargaining collectively or processing grievances is calculated on unity of action. Article 78, exactly this type of prohibition, therefore implements the aims and objectives of

27

labor unions as protected by precepts of a national labor policy in force for well over half a century.

To suggest as do the Appellants that Article 78 is illegal on its face is a concept that flouts the basic precepts of organized labor and free speech rights. To encourage willful circulation of untrue statements within a union is to generate dissension and disharmony within the union's rank and file, weaken the union's effectiveness and play into the hands of those segments of society that have steadfastly opposed and battled the legitimacy of organized labor and collective bargaining, all of which have been hallmarks of our national labor policy at least since 1933 and 1935.

Accordingly, I would hold as a matter of law that Article 78 is one of the "reasonable rules" that a union may adopt in accordance with S 411(a) (2). Thus, in my view, any nebulous, so-called chilling effect of Article 78 is insufficient to create a justiciable controversy.

IV.

The majority determines that certain precedents of this court dictate that Appellants' case is still alive because Appellants asserted declaratory and equitable claims in addition to their claims for monetary relief. See Maj. Op. at 11 ("[W]e view our decisions in Mallick v. International Brotherhood of Electrical Workers, 644 F.2d 228 (3d Cir. 1981) and Semancik v. United Mine Workers of America District # 5, 466 F.2d 144 (3d Cir. 1972) as requiring that his claim for declaratory and injunctive relief be heard."). An examination of these cases indicates that they constitute no meaningful authority for the majority's attempt to breathe life into this moribund case.

A.

In Mallick, we determined that "[h]arm to free speech rights . . . is not measured solely in economic terms, nor must concrete punishment be meted out to confer standing to sue." 644 F.2d at 235. We then explained:"The right to speak one's views is so fundamental that the spectre of

28

punishment, or the uncertainty created by a vaguely worded prohibition of speech, is injurious as well." Id.

In discussing Mallick, the majority states:

> We noted that the mere fact that the members were charged, as well as the possibility of future charges based on the challenged prohibitions, could have a substantial chilling effect on plaintiffs' and other union members' exercise of their free speech rights: "The goal of union democracy, achieved through the expression of opposing viewpoints, would be difficult to realize if members felt deterred from expressing their opinions by the prospect of disciplinary proceedings."[Mallick, 644 F.2d] at 236. Accordingly, we remanded for the district court to consider whether the provisions at issue violated S 411 of the LMRDA. Id.

Maj. Op. at 16. This intimates that the only injury suffered by the Mallick plaintiff union members was the chilling of their free speech rights. In fact, in Mallick , there was substantial economic injury averred as well as "the spectre of punishment" for engaging in protected activity. For example, the Mallick plaintiffs alleged harassment for talking to newsmen and communicating with the National Labor Relations Board, Congressmen and Labor Department officials. They also claimed retaliation by the union in the form of less desirable job assignments. We stated that "[t]hese claims of emotional distress and economic injury were deemed sufficient to support damage awards by the jury, and they confer standing to challenge the validity of a union constitution which was invoked to punish them for protected conduct." Mallick, 644 F.2d at 236.

Here, by contrast, there are no allegations of economic injury qua membership in the union. The allegations of injury are insufficient to satisfy even the lenient requirements of standing for a S 411(a)(2) claim. There was only one charge brought against Ruocchio and, as detailed in great length above, see supra Part III, it was for unprotected speech. See Linn, 383 U.S. at 63 ("[T]he most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth.") (emphasis added);

29

Garrison, 379 U.S. at 75 ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection."); New York Times, 376 U.S. at 279–280 (holding that the First Amendment does not shield the publication of defamatory falsehood made with actual malice). Ruocchio's temporary removal from office, and any economic loss he suffered as an officer is not an injury that may be recouped under the LMRDA and thus is also insufficient to confer standing. Harrison, 518 F.2d at 1281. The only remaining allegation of injury is Appellants' assertion that their speech has been "chilled." To consider this bald allegation sufficient to confer standing under the LMRDA is to eviscerate the entire concept of standing in the free speech context.

The majority believes that the material facts of this case and those of Mallick are identical or substantially similar. This suggestion does not reflect the complete material or adjudicative facts in that case. As stated above, the Mallick plaintiffs were charged for clearly protected activity and received less desirable job assignments.

> A judicial precedent attaches a specific legal consequence to a detailed set of facts in an adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court or a lower court in the judicial hierarchy.

Allegheny General Hospital v. Nat'l Labor Relations Bd., 608 F.2d 965, 969–970 (3d Cir. 1979) (footnote omitted and emphasis added). Mallick does not qualify as a legal precedent for this case because the basic differences in material or adjudicative facts outweigh the resemblances to qualify it as a proper analogy.

B.

Nor may Appellants find support in the teachings of Semancik. At issue in Semancik was Article X, Section 10 of the United Mine Workers constitution, which provided in part:

30

> [A]ny member or members resorting to dishonest or questionable practices to secure the election or defeat of any candidate for district office shall be tried by the district executive board and fined, suspended or expelled as the magnitude of the transgression may warrant.

See Semancik, 466 F.2d at 147 (emphasis added). We held that Section 10 "presents a threat and obstacle to free speech because it is so vague and ill-defined that whenever a union member might exercise the right guaranteed to him under the LMRDA, he is in peril of violating the provision. In response to such a union rule, a reasonable man might well refrain from taking full advantage of his rights." Id. at 153-154.

I am unwilling to equate the "vague and ill-defined" Section 10 with the clear and unambiguous terms of Article 78, which prescribes penalties for any member who "willfully circularizes untrue statements." The average union member would certainly understand what is meant by "untrue statements" or "circularizes." This is a far cry from the obtuse expressions in Semancik:"dishonest or questionable practices." Nor can we fault the use of the word "willfully," in the sense that this means intentionally or knowingly as distinguished from accidentally or negligently. Were we to hold otherwise, hundreds of federal criminal statutes in Title 18 of the United States Code would suffer the same lethal fate. I therefore have no difficulty in distinguishing Article 78 in this union's constitution from the condemned Article X, Section 10 in the United Mine Workers constitution in Semancik.

Nor does the following portion of the Semancik opinion, relied upon by the majority, give effective support to its theory:

> [C]ourts have responded by making clear that labor organizations properly exercise their disciplinary powers only over a limited area of proscribed conduct inimical to the union as an entity and the collective bargaining mechanism. Unless statements fall into these categories, they are protected from union action even if libelous.

31

Id. at 153, quoted in Maj. Op. at 17. Consistent with Semancik, Article 78 does prohibit "conduct inimical to the union as an entity and the collective bargaining mechanism." As stated in detail above, see supra Part III, the mantra of organized labor is "In union, there is strength." By proscribing the willful circularizing of untrue statements, Article 78 serves that purpose by minimizing acrimony and promoting harmony within the ranks.

Moreover, notwithstanding the quoted language of Semancik, the reference that statements of union members are protected from union action "even if libelous" is simply not a correct statement of ruling Supreme Court case law. This proposition flies in the face of the unambiguous holding of the Court in Linn:

> [T]he most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth. But it must be emphasized that malicious libel enjoys no constitutional protection in any context. After all, the labor movement has grown up and must assume ordinary responsibilities. The malicious utterance of defamatory statements in any form cannot be condoned, and unions should adopt procedures calculated to prevent such abuses.

383 U.S. at 63 (emphasis added). Accordingly, the teachings of Semancik do not support the existence of a justiciable controversy in this case.

C.

Therefore, the two major cases that form the linchpin of the majority's opinion do not support their conclusions. Moreover, acceptance of the notion that any union member who is charged with violating Article 78--without proof of actual financial injury or of the deprivation of the right to vote, to discuss union matters or to hold office--may bring an action in federal court to challenge the legality of the Article will generate a state of labor union disruption that will hail unions, their members and their officers into federal court every time any disciplinary rule of a union is invoked by a member, officer or committee against another, under the guise that merely initiating an internal union

32

proceeding, in and of itself, violates a member's"right to meet and assemble freely." This certainly does not promote union democracy, nor does it promote unity and harmony within the rank and file. Although I am absolutely convinced that my distinguished colleagues certainly did not so intend, the effect of their holding is to weaken and undermine labor union effectiveness as envisioned and protected by our national labor policy.

V.

In sum, the abstract injury asserted by the Appellants-- the right to be free from any application of Article 78 to them--does not meet the threshold requirement that"[a] plaintiff must always have suffered a distinct and palpable injury to himself that is likely to be redressed if the requested relief is granted." Gladstone Realtors, 441 U.S. at 100 (internal citations and quotations omitted).

Because Article 78 is reasonable as a matter of law, it is impossible to discern how Appellants sustained the necessary injury entitling them to an injunction restraining the future operation of the article. Appellants were not prevented from criticizing union policies or from mounting effective challenges to union leadership. They were not denied an opportunity to work. They were not denied the opportunity to express any views, arguments or opinions or to express at all meetings of the labor organizations their views of candidates in an election of the labor organization or of any business properly before the meeting.

Rather, Ruocchio was precluded only from "willfully circularizing untrue statements." As punishment for his alleged violation of Article 78, he was not expelled from membership; he was denied only the opportunity, for several months, to exercise his office as treasurer. On appeal after trial, he was restored to his office with all full privileges and rights. The only injury he sustained was his temporary removal from office. Because this was an injury as an officer and not as a member, the LMRDA does not afford relief.

Accordingly, I dissent and would affirm the judgment of the district court for the foregoing reasons.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

34